KETHLEDGE, J., delivered the opinion of the court, in which RYAN, J., joined. MARTIN, J. (pp. 702-06), delivered a separate opinion concurring in part and dissenting in part.
*698 AMENDED OPINION
KETHLEDGE, Circuit Judge.
Zamira Japarkulova, a native and citizen of the Kyrgyz Republic, petitions for review of an order of the Board of Immigration Appeals denying her application for asylum. We conclude that the Board erred by failing to provide a reasoned explanation for its conclusion that Japarkulova did not experience past persecution. But we also conclude that the error was harmless. We therefore deny the petition.
I.
Japarkulova was admitted into the United States as a non-immigrant visitor in September 2001.. Her visa was due to expire in March 2003. In May 2002, however, Japarkulova submitted an application for asylum and withholding of removal to the Department of Homeland Security (DHS). An asylum officer denied her application in August 2003, at which point DHS issued a Notice to Appear, alleging that Japarkulova was removable for having overstayed her visa. See 8 U.S.C. § 1227(a)(1)(B). At a hearing before an immigration judge (IJ), Japarkulova conceded removability but renewed her requests for asylum and withholding of removal, and added an application for relief under the Convention Against Torture.
At a subsequent hearing, Japarkulova testified in support of her requests for relief. She claimed that she had been persecuted in the Kyrgyz Republic because of her opposition to the corruption of Mariam Akayeva, the wife of then-President Askar Akayev. She explained that, as a result of her advanced education and work as a university professor,, she had become involved with the Kelechek Foundation, an organization founded in 1991 to provide educational support to gifted Kyrgyz students. During her time with the Kelechek Foundation, Japarkulova worked closely with Akayeva, the head of the Foundation.
In roughly 1993, Japarkulova learned that Akayeva was mishandling Foundation funds. According to Japarkulova, Akayeva was selling scholarships to attend several competitive universities in the United States, even though the scholarships were supposed to be allocated based on merit. After Japarkulova raised the issue of Akayeva’s corruption with the Kyrgyz Minister of Education, she was asked to visit the president’s office to discuss the charge. When Japarkulova arrived for the meeting, however, security guards seized the documentation that she had brought with her. She then met with the Minister of National Security, who told her that she would be jailed if she did not abandon her efforts to expose Akayeva’s corruption. The security minister also threatened that the government would arrange a fatal “accident” for Japarkulova if she did not desist. Because of the history of political violence in her country, Japarkulova took the threat seriously.
Japarkulova also testified that she was fired from a series of jobs because of her opposition to Akayeva’s corruption. Twice, her employer informed her that she was being fired due to pressure from the president. On another occasion, Japarkulova was fired shortly after Akayev visited her employer’s office and found her working there. On each occasion, however, Japarkulova was able to find a new position shortly after being fired.
In 1997, Japarkulova came to the United States on a Fulbright Scholarship. She testified that she did not seek asylum at that time because she hoped that Akayev would lose an upcoming election. In 1999, she returned to the Kyrgyz Republic, where she began work as a volunteer for the opposition Ar-Namys party. Akayev *699 won the election, however, and thereafter jailed the founder of the Ar-Namys party, Felix Kulov. Finally, in August 2001 Japarkulova received a subpoena to appear at what she later determined was a special national security office in the local police station. Rather than obey the subpoena, she fled to Moscow, where she stayed with a friend before ultimately coming to the United States.
At the close of the hearing, the IJ denied Japarkulova’s applications for relief. Although the IJ credited her testimony and found that she had been mistreated because of a political opinion, he concluded that the mistreatment did not rise to the level of past persecution. The IJ also found that conditions in the Kyrgyz Republic had improved since Japarkulova left, which meant that she could not demonstrate a well-founded fear of future persecution.
The Board of Immigration Appeals affirmed in a two-page opinion. It first noted that Japarkulova had abandoned her claims for withholding of removal and Torture Convention relief by failing to discuss them in her brief. With respect to her asylum claim, the Board adopted the IJ’s reasoning, concluding that Japarkulova had not shown past persecution or a well-founded fear of future persecution.
This petition for review followed.
II.
To be eligible for asylum under the Immigration and Nationality Act (INA), an alien must demonstrate that he or she is a “refugee.” 8 U.S.C. § 1158(b)(1)(A); see 8 C.F.R. § 1208.13(a) (“The burden of proof is on the applicant for asylum to establish that he or she is a refugee”). The INA defines “refugee” as an alien “who is unable or unwilling to return to” his country of origin “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1101(a)(42)(A). Here, the Board credited Japarkulova’s testimony and accepted the IJ’s conclusion that the mistreatment she experienced was on account of a political opinion. The only issues before us, therefore, are whether that mistreatment rose to the level of past persecution and, if not, whether Japarkulova demonstrated a well-founded fear of future persecution.
The INA does not define “persecution,” and to our knowledge the Board has not either. See Sahi v. Gonzales, 416 F.3d 587, 588-89 (7th Cir.2005). Our cases have given the term some content, but mostly by identifying what does not count. See, e.g., Ali v. Ashcroft, 366 F.3d 407, 410 (6th Cir.2004) (“[P]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive”) (alteration in original; quotation marks omitted); Mikhailevitch v. INS, 146 F.3d 384, 390 (6th Cir.1998) (persecution “requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty”). And by way of example, we have explained that “actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture.” Gilaj v. Gonzales, 408 F.3d 275, 285 (6th Cir.2005) (quotation marks omitted).
The Board was on solid ground in concluding that Japarkulova’s string of job losses did not amount to persecution. Japarkulova contends that, in dismissing her claim of economic persecution, the Board ignored our decision in Berdo v. INS, 432 F.2d 824 (6th Cir.1970), and its own prece *700 dential decision in In re T-Z-, 24 I. & N. Dec. 163 (B.I.A.2007). But the Board acknowledged that economic deprivation will sometimes amount to persecution; it held that Japarkulova’s job losses were not persecution because she did not show that “ ‘the resulting conditions [were] sufficiently severe.’ ” Board Op. at 1 (quoting Daneshvar v. Ashcroft, 355 F.3d 615, 624 n. 9 (6th Cir.2004)). As the Board noted, although Japarkulova was fired from a series of jobs, on each occasion she moved quickly to another high-level position in the Kyrgyz economy. This was not persecution. See Berdo, 432 F.2d at 846 (observing that the “deliberate imposition of substantial economic disadvantage” may constitute persecution) (emphasis added; quotation marks omitted); Daneshvar, 355 F.3d at 624 (finding no persecution where, because of discrimination, alien could not work for the government but could find employment in the private sector).
More problematic, however, was the Board’s treatment of the threat Japarkulova received from President Akayev’s security minister. After the IJ’s opinion failed to mention the incident, the Board said that “the threats or harassment [Japarkulova] received do not amount to persecution,” reasoning that persecution requires “ ‘more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty.’ ” Board Op. at 1-2 (quoting Ndrecaj v. Mukasey, 522 F.3d 667, 674 (6th Cir.2008)). But Japarkulova was threatened with death (albeit implicitly) if she did not abandon her attempts to expose Akayeva’s corruption. The threat, moreover, came from the highest reaches of her country’s government. Without further explanation, it is hard to understand the Board’s conclusion that this treatment amounted only to “verbal harassment or intimidation.”
Perhaps the Board read our cases to suggest that a threat, unaccompanied by physical abuse, could never amount to persecution. But that proposition runs contrary to a number of cases, from this circuit and others, which observe that physical abuse is not an absolute prerequisite to a finding of persecution. See, e.g., Ouda v. INS, 324 F.3d 445, 454 (6th Cir.2003); Li v. Attorney General, 400 F.3d 157, 164-65 (3d Cir.2005); Lim v. INS, 224 F.3d 929, 936-37 (9th Cir.2000); Boykov v. INS, 109 F.3d 413, 416 (7th Cir.1997). It is also a doubtful reading of the statutory term. When members of a minority sect are credibly threatened with death if they do not convert to the majority faith, it seems natural to say that they have been persecuted even if they choose accommodation rather than martyrdom. See Kantoni v. Gonzales, 461 F.3d 894, 898 (7th Cir.2006) (“A credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution”).
So it fell to the Board to explain why the death threat Japarkulova received was not of the sort that would qualify as past persecution — or to clarify, notwithstanding the cases cited above, that a threat standing alone can never be persecution. Had it done so, its resolution of the issue might have received Chevron deference, which we accord to the Board “as it gives ambiguous statutory terms ‘concrete meaning through a process of case-by-case adjudication.’ ” INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)); see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). (We say might because the Board’s deci *701 sion here was a non-precedential, single-member order, which several courts have held are not entitled to Chevron deference. See, e.g., Rotimi v. Gonzales, 473 F.3d 55, 57 (2d Cir.2007) (per curiam); Garcia-Quintero v. Gonzales, 455 F.3d 1006, 1014 (9th Cir.2006).) But the Board bypassed the issue altogether, leaving us without the reasoned explanation that is a predicate to deferential review. Berhane v. Holder, 606 F.3d 819, 825 (6th Cir.2010); Gjyzi v. Ashcroft, 386 F.3d 710, 714 (6th Cir.2004).
In the ordinary case that error would require a remand to the Board for further consideration, since under the Chenery doctrine a reviewing court ordinarily should not uphold administrative action based on reasons different from those given by the agency. See SEC v. Chenery Corp., 318 U.S. 80, 88-89, 63 S.Ct. 454, 87 L.Ed. 626 (1943); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); see also INS v. Ventura, 537 U.S. 12, 16-17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002); Shkabari v. Gonzales, 427 F.3d 324, 327-28 (6th Cir.2005). But even when the agency’s reasoning was inadequate, its decision may be upheld on the basis of harmless error if the petitioner’s prospects are otherwise so weak that there is no “reason to believe that ... remand might lead to a diffei’ent result.” Shkabari, 427 F.3d at 328 (quotation marks omitted); see Kadia v. Gonzales, 501 F.3d 817, 821 (7th Cir.2007). And for several reasons, we conclude that the Board’s error was harmless here.
The cases recognizing that threats can sometimes amount to persecution emphasize that they will do so only in exceptional cases. “In the vast majority of cases, ... mere threats will not, in and of themselves, compel a finding of past persecution.” Boykov, 109 F.3d at 416. Instead, so-called “unfulfilled threats” will ordinarily be “more properly viewed as indicative of the danger of future persecution.” Id.; see also Lim, 224 F.3d at 936 (“Threats standing alone ... constitute past persecution in only a small category of cases”); Li, 400 F.3d at 165 (same). Only “threats of a most immediate and menacing nature” can possibly qualify as past persecution. Boykov, 109 F.3d at 416; see also Lim, 224 F.3d at 936 (threats will qualify as persecution only when they “are so menacing as to cause significant actual suffering or harm”) (quotation marks omitted); Li, 400 F.3d at 165 (to qualify as persecution, threats must be “sufficiently imminent or concrete”).
Here, the security minister threatened that, if Japarkulova continued her efforts to expose Akayeva’s corruption, the government would arrange for a fatal “accident.” Although the threat was ominous, particularly in a country with a history of political violence, it was not the sort of “immediate and menacing” threat that amounts to persecution standing alone. Boykov, 109 F.3d at 416. Moreover, the incident occurred in either 1993 or 1994, and Japarkulova did not flee the Kyrgyz Republic for good until 2001. That long delay, during which Japarkulova did not suffer any physical mistreatment from the government, lessens the severity of the threat. See Lim, 224 F.3d at 936. Finally, the minister’s threat did not lead Japarkulova to abandon her political opposition to the Akayev regime. Indeed, she later worked as a volunteer for the Ar-Namys opposition party. Thus, there is no indication that Japarkulova was able to avoid violence only by abandoning her “lawful political ... associations or beliefs.” Kantoni, 461 F.3d at 898. Under these circumstances, we see no reasonable prospect that “remand might lead to a different result,” Shkabari, 427 F.3d at 328, and we therefore conclude that the Board’s error was harmless.
*702 That leaves only the Board’s conclusion that Japarkulova did not establish a well-founded fear of future persecution if removed to the Kyrgyz Republic. We give that decision substantial-evidence review. See Marku v. Ashcroft, 380 F.3d 982, 986 (6th Cir.2004). The Board’s conclusion was based on the IJ’s finding that conditions in the Kyrgyz Republic had improved since Japarkulova departed in 2001. Citing the State Department’s 2006 country report, the IJ noted that President Akayev’s regime was ousted in March 2005 and that a new president, Kurmanbek Bakiyev, was elected in July 2005. The IJ also discussed the government’s treatment of the Ar-Namys party, relying on a supplemental letter filed by the State Department. The IJ observed that the party’s founder, Felix Kulov, had been released from prison when Akayev’s regime fell, and that he later served as prime minister for several years. The IJ also noted that the party remained active in the Kyrgyz Republic and that the State Department was not aware of residual discrimination against its members. He thus saw no risk of persecution on account of Japarkulova’s membership in the party.
In contending that she continues to face persecution in the Kyrgyz Republic even though President Akayev is no longer in power, Japarkulova suggested that Akayev’s successor, President Bakiyev, maintained ties to Akayeva and was implicated in some of her corrupt dealings. But that argument suggests, at most, that conditions did not improve as much as one might have expected given that President Akayev is out of power; it offers no reason to think that conditions have actually gotten worse. Substantial evidence supports the Board’s conclusion that Japarkulova did not establish a well-founded fear of future persecution.
In closing, we acknowledge that current events may have overtaken our decision in this case. President Bakiyev’s regime was itself overthrown in April 2010, following bloody antigovernment protests throughout the Kyrgyz Republic. But that development is beside the point for the purposes of our decision, because a court of appeals must decide an alien’s petition for review “only on the administrative record.” 8 U.S.C. § 1252(b)(4)(A). If Japarkulova believes that recent events in the Kyrgyz Republic have affected her eligibility for asylum, her proper recourse is to file a motion to reopen her removal proceedings with the Board.
The petition for review is denied.