NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0641n.06

Nos. 13-3704/4222

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 18, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MIKHAIL NIFADEV, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE BOARD OF |
| | ) | IMIMGRATION APPEALS |
| | ) | |
| ERIC H. HOLDER, JR., | ) | |
| | ) | |
| Respondent. | ) | |

_____

BEFORE: COLE, Chief Judge; BOGGS and STRANCH, Circuit Judges.

BOGGS, Circuit Judge: Mikhail Nifadev, an Uzbek national of Russian descent, seeks review of the decision of the Board of Immigration Appeals (BIA) denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), as well as his motion to reopen proceedings. For the reasons given below, we grant Nifadev's petition for review.

I

Nifadev was born in Tashkent, Uzbekistan in what was then the Soviet Union. Though born in Uzbekistan, Nifadev is visibly of Russian descent and does not speak Uzbek. In addition, though he was raised Russian Orthodox, he has since become a Baptist. Nifadev came to the Unites States in May 2003 as a nonimmigrant visitor for pleasure with leave to remain for six months. Having exceeded his leave to remain, he filed an asylum application in April 2004, which was denied by an asylum officer. Shortly thereafter, the Department of Homeland Security (DHS) sent Nifadev a Notice to Appear (NTA), which alleged removability under 8

1

U.S.C. § 1227(a)(1)(B) for having remained in the United States beyond his departure date without authorization.

Removal proceedings against Nifadev began with an initial hearing on September 27, 2004 and were continued for two calendar hearings April 19 and September 6, 2005. There then followed two merits hearings. At the first merits hearing, held on October 18, 2007, the IJ took documentary submissions and testimony from Nifadev. At the second merits hearing, on March 10, 2011, the IJ took testimony from two of Nifadev's friends, both of whom were also ethnic Russians and Uzkbek nationals.

Nifadev testified that, following Uzbekistan's independence from the Soviet Union, the treatment he received at the hands of Uzbek officials became steadily worse, presumably because of his Russian ethnicity. As background, Nifadev stated that he attended university to become an aircraft engineer and was employed as a maintenance engineer at the Tashkent airport. According to Nifadev, his first encounter with Uzbek officials came in 1999 upon his return from a business trip to Georgia and China when he was interrogated by an Uzbek national-security agent about the purpose of his trip abroad. The next encounter occurred in 2000 when a police officer detained Nifadev at a subway station, searched him, examined his passport and interrogated him about his travels. Though he was eventually allowed to leave unharmed, the police took 30% of the money Nifadev had at the time he was arrested. Another incident occurred in 2001 upon Nifadev's return from a trip to the United States. The same security official who interrogated Nifadev in 2000 summoned him to the national security agency's headquarters. The official accused him of committing bribery and questioned him about his trip to the United States.

2

The incidents recounted by Nifadev became markedly worse starting in the winter of 2002. Nifadev testified that, during a night shift at the airport, a national-security agent accused him of permitting lax security at his facility and of overseeing employees who spread Christian propaganda. As the incident escalated, the security agent drew his pistol, pointed it in Nifadev's face, and said, "what[,] do you think I don't have a weapon?"

Nifadev was eventually fired from his job at the airport in 2002 while he was on vacation in the United States. Though he did not know it at the time, a friend told him years later that he was fired at the demand of the national-security agency because he was travelling in the United States and the agency's officials became suspicious of him. Upon his dismissal, his company did not return his employment book, a very important document without which Uzbek workers cannot obtain a legitimate job. Because he lacked an employment book, Nifadev was unable to obtain legitimate work and he and his wife were forced to earn a living by taking odd jobs—Nifadev as an unlicensed taxi driver and his wife selling flowers.

His work as a taxi driver resulted in even greater exposure to police interference. On one occasion, in 2003, Nifadev was pulled over by police who conducted an illegal search of his car and then attempted to purchase his vehicle from him at a discounted rate, allegedly a common practice brought about by the number of ethnic Russians willing to sell their possessions at very low prices because they were fleeing harassment in Uzbekistan. On another occasion in 2003, a police officer pulled him over for an illegal turn. The officer demanded that Nifadev sign a blank citation form and, when Nifadev refused, demanded a signature after he filled out the citation in Uzbek. Again, Nifadev refused. Another officer arrived, accused Nifadev of driving while intoxicated, and the two escorted him to a mobile sobriety lab located in the back of a minivan. Once inside, the police handcuffed him behind his back, asphyxiated him by placing a

3

plastic bag over his head for approximately 20 seconds and threatened him saying, "Russian Ivan, do you understand that we can do anything we want toward you here?" He was released after the police confiscated his driver's license.

After detailing his encounters with Uzbek officials, Nifadev testified regarding the systematic discrimination against ethnic Russians in Uzbekistan and regarding the consequences of being a Baptist were he to return to Uzbekistan.

Two witnesses, Tatiana Kalugina and Vladimir Izgarodin, both Uzbek nationals of Russian ethnicity like Nifadev, testified at the second merits hearing. Both provided substantially similar testimony regarding the political climate of Uzbekistan, the mistreatment of ethnic Russians at the hands of the national-security agency, and their fear of being charged as traitors for having lived so long outside the country should they attempt to return to Uzbekistan.

The IJ rendered her decision on November 2, 2011. As an initial matter, the IJ found Nifadev credible. Nifadev corroborated many of his claims with external evidence and there were no inconsistencies within his testimony or between his testimony and his evidentiary submissions. Also important was the fact that when Nifadev testified, the government did not argue that he was not credible or attempt to rebut his evidence. The IJ also found the two witnesses credible, though she pointed out that the value of their testimony was limited.

Having found Nifadev credible, the IJ went on to deny Nifadev's asylum application because he "did not establish he suffered past persecution on account of his race, nationality or religion." She determined that the incidents recounted by Nifadev "do not cross the line from harassment to persecution" and that for some of the incidents Nifadev "did not establish that the stops were on account of any protected ground." She went on to find that Nifadev also failed to demonstrate an objectively reasonable fear of persecution should he return, a prerequisite for

4

demonstrating the alternate basis of claiming asylum should an alien fail to demonstrate past persecution. The IJ concluded by denying Nifadev's application for withholding of removal and protection under CAT.

Nifadev filed a timely appeal to the BIA in which he argued that, because his unrebutted testimony was considered credible, there was sufficient evidence as a matter of law to have found persecution. He also argued that the IJ was in error in denying withholding of removal and protection under CAT. Lastly, Nifadev filed a concurrent motion to reopen based on intervening Sixth Circuit case law. On May 14, 2013, the BIA, reviewing the IJ's findings of fact for clear error and her legal conclusions de novo, rejected Nifadev's arguments. The board dismissed his appeal and denied his motion to reopen proceedings. Following the BIA's dismissal of his appeal, Nifadev filed a timely motion to reconsider, which the BIA denied for having raised the same arguments he raised in his motion to reopen. Nifadev filed a timely petition for review.

## II

"When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the basis for review." *Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009). We review the BIA's findings of fact, including any credibility determinations, under the deferential substantial-evidence standard. *Ibid*. Under that standard, we "uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (internal quotation marks omitted). Substantial-evidence review does not permit reversal "simply because we would have decided the matter differently." *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). The BIA's findings of fact are conclusive unless "any reasonable

5

adjudicator would be compelled to conclude to the contrary." *Ibid.* (quoting 8 U.S.C. § 1252(b)(4)(B)). In contrast, this court reviews the BIA's legal conclusions de novo and in doing so defers "to the BIA's reasonable interpretations of the [Immigration and Nationality Act (INA)]." *Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005).

"The decision to grant or deny a motion to reopen . . . is within the discretion of the Board." 8 C.F.R. § 1003.2(a). Accordingly, the BIA's denial of a motion to reopen is reviewed for abuse of discretion. *See Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005). The same abuse-of-discretion standard applies to this court's review of the BIA's denial of a motion to reconsider. *Sswajje v. Ashcroft*, 350 F.3d 528, 532 (6th Cir. 2003). In reviewing for abuse of discretion, the court will reverse when the BIA's decision "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis . . . ." *Allabani*, 402 F.3d at 675.

III

In spite of the fact that the IJ found the un-rebutted testimony of Nifadev and his two witnesses credible, she nevertheless found that, as a matter of law, Nifadev did not make a sufficient showing that he suffered persecution at the hands of Uzbek authorities.

The BIA's decision as to whether to grant an application for asylum has two parts. First, the Board determines whether an asylum-seeker is a "refugee" and second, it determines whether the applicant's circumstance "merits a favorable exercise of discretion by the Attorney General." *Perkovic v. I.N.S.*, 33 F.3d 615, 620 (6th Cir. 1994). In this petition for review, we examine the BIA's determination of whether the petitioner is a refugee. In such cases, if the BIA was in error and the petitioner is a refugee, we then remand the petitioner's case for the BIA's further consideration as to whether the petitioner's circumstances warrant a discretionary grant of

6

asylum. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987) ("It is important to note that the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee. Instead, a finding that an alien is a refugee does no more than establish that 'the alien may be granted asylum in the discretion of the Attorney General.'" (quoting INA § 208(a)) (second emphasis omitted)).

The INA confers discretion upon the Attorney General to grant asylum to aliens that he determines to be a "refugee." 8 U.S.C. § 1158(b)(1)(A). A refugee includes "any person who is outside [his or her] country of [nationality] . . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A); *see I.N.S. v. Elias-Sacarias*, 502 U.S. 478, 481 (1992).

Persecution has not been defined by either the INA or the BIA. *Japarkulova v. Holder*, 615 F.3d 696, 699 (6th Cir. 2010). However, it has been described by the BIA as, "the infliction of harm or suffering by the government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim." *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (referencing a description of persecution originally formulated by the BIA in the context of political opinion and activity); *In re Kasinga*, 21 I.&N. Dec. 357 (BIA 1996). Persecution is not mere harassment, but is "an extreme concept that does not include every sort of treatment our society regards as offensive." *Japarkulova*, 615 F.3d at 699. A successful demonstration of persecution requires "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003). Persecution can take a wide variety of forms; the "types of actions that might cross the line from harassment to

7

persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Haider v. Holder*, 595 F.3d 276, 286–87 (6th Cir. 2010) (internal alterations omitted). Lastly, no single particular incident or type of incident is necessary to constitute persecution. Events that would not be deemed persecution when taken on an individual basis might well cross the line to persecution when viewed in the aggregate. *See id.* at 287.

An asylum-seeker, in attempting to establish that he is a refugee, can satisfy the persecution requirement in one of two alternate ways. The first method is by demonstrating that he was subject to past persecution. Such a demonstration, if successful, raises a (rebuttable) presumption that he has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *see Mikhailevitch v. I.N.S.*, 146 F.3d 384, 389 (6th Cir. 1998). If the asylum-seeker did not suffer persecution in the past, he can still qualify for asylum by demonstrating that he "has a fear of persecution in his or her country" on account of protected grounds, that "[t]here is a reasonable possibility of suffering such persecution if he [] were to return," and that he "is unable or unwilling to return to . . . that country because of such fear." 8 C.F.R. § 208.13(b)(2)(i). Further, in order to demonstrate a well-founded fear of future prosecution, the asylum seeker's fear must be both "subjectively genuine and objectively reasonable." *Mikhailevitch*, 146 F.3d at 389.

Nifadev sought, by the first method, to establish that he was a refugee by detailing incidents of what he believed to be past persecution. He testified that his Russian ethnicity made him a target of ill-will in post-Soviet Uzbekistan, that he was harassed by security officials after travelling and at traffic stops. He testified that he lost his job at the behest of the national-security agency and that, once fired, the airport authorities refused to surrender his work

8

documentation, thus prohibiting subsequent legitimate employment. Last, he testified about two incidents of real and threatened violence, the first when a national-security agent drew a pistol and pointed it in his face and the second when he was detained for an alleged traffic violation and had a bag placed over his head, briefly obstructing his breathing. The government did not attack Nifadev's testimony and the IJ found him credible. None of the facts are in dispute.

This case turns on the IJ's finding that Nifadev "did not establish he suffered past persecution on account of his race, nationality, or religion." The IJ justified her decision by saying that, while evidence supports Nifadev's claim that he lost his job and suffered incidents of non-violent harassment because of his Russian ethnicity, he was still able to support himself and his family. She further found that the police stops, including the one in which a bag was placed over his head, were not based on a protected ground. In the end, the IJ found that "[e]ven viewed collectively, these incidents did not rise to the level of persecution as they were very brief detentions with no harm inflicted. The court finds they do not cross the line from harassment to persecution." The BIA affirmed the IJ's reasoning: "We find, for the reasons set forth in the Immigration Judge's decision, that the respondent failed to meet his burden of proving that he suffered past persecution or has a well-founded fear of future persecution . . . ."

Since the IJ found all of Nifadev's testimony and evidence credible, she must have concluded that the evidence submitted was not sufficient to demonstrate past persecution as a matter of law—a decision subject to de novo review. This is not as clear-cut as it might seem. There is a great breadth of mistreatment that has been deemed persecution and a great breadth that has been found mere harassment. It is worth repeating that, since the IJ found Nifadev's testimony credible, on review we take all of Nifadev's representations as true. *See Gilaj v. Gonzales*, 408 F.3d 275, 285–86 (6th Cir. 2005).

9

The IJ's determinations notwithstanding, the incident in the mobile lab in which Nifadev was handcuffed and had a bag placed over his head certainly appears to meet the definition of persecution: "the infliction of harm or suffering by the government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim." *Pilica*, 388 F.3d at 950. All of the encounters Nifadev had with the national-security agency, from losing his job to having a gun pointed at him to being briefly suffocated, stand together as "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Ouda*, 324 F.3d at 452 (internal quotation marks omitted).

The IJ stated that the encounters did not cross the line from harassment to persecution. But fundamentally, the line between the two is clear: "Persecution entails punishment or the infliction of suffering or harm, but harassment or discrimination without more does not rise to the level or persecution." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (internal quotation marks omitted). The threat to Nafadev's life embodied in the security agents' declaration that they could do anything they wanted, his suffocation with a plastic bag demonstrating that his murder could be accomplished easily, and the deprivation of Nifadev's ability to defend himself by handcuffing, seem to constitute "infliction of suffering or harm."

Moreover, there was a critical error in the IJ's reasoning that bears particular consideration. The IJ bolstered her finding by stating that Nifadev was subject to the 20-second suffocation for reasons other than protected grounds. This is almost certainly incorrect. Nifadev testified that, once the police removed the bag from his head one of them said, "Russian Ivan,"[1] do you understand that we can do anything we want toward you here?" Even under substantial-evidence review, we find that the IJ misinterpreted Nifadev's testimony. Perhaps the IJ was

---

[1] Nifadev's first name is Mikhail, not Ivan.

correct that the *traffic stop* was not based on a protected ground, but the subsequent interrogation and mistreatment in the mobile lab was. The ethnic slur and threat to Nifadev's life were both because of his Russian ethnicity.

Thus, Nifadev was subjected to credible threats to his life and subjected to a period of suffocation at the hands of the police when handcuffed and helpless in a police vehicle on account of a protected ground. This treatment bears a striking resemblance to torture, one of the grounds explicitly stated by this court to be a potential basis by which an asylum-seeker can demonstrate past persecution. 8 C.F.R. § 1208.18(a)(1) (defining torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" in order to punish, intimidate, coerce, gain information or if it is done "based on discrimination of any kind, when . . . inflicted by . . . a public official"); *Haider*, 595 F.3d at 286–87 ("[T]he types of actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture."). Under a strict reading, Nifadev was abused by police in their official capacity by means of mental suffering inflicted by threatened suffocation. Even if Nifadev's treatment is not severe enough to constitute torture, it very likely rises to the level of persecution.

Because the IJ appears to have erred in her determination that Nifadev did not suffer past persecution and because the IJ clearly misinterpreted Nifadev's credible testimony regarding the ethnic animus of the Uzbekistan security officials, we find that Nifadev has made out a credible case of being a refugee under the definitions of 8 U.S.C. § 1158(b)(1)(A).

VI

For the reasons above, we GRANT Nifadev's petition for review, VACATE the BIA's decision, and REMAND with the following instructions: (1) The BIA should determine whether

11

the conduct of the Uzbek officials to which Nifadev credibly testified amounts to persecution. (2) Should the BIA find the Uzbek officials' conduct to constitute persecution, the BIA should determine whether Nifadev's circumstances warrant a favorable exercise of the Attorney General's discretion to grant his application for asylum. (3) The BIA should also reconsider its determinations regarding Nifadev's application for withholding of removal and protection under CAT in light of this opinion.