RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NOOR JAHAN SAKHAWATI,

  *Petitioner,*

  *v.*

  No. 15-3575

LORETTA E. LYNCH, Attorney General,

  *Respondent.*

On Petition for Review of a Final Administrative Order
from the Board of Immigration Appeals.
No. A098 225 911.

Argued:  January 27, 2016

Decided and Filed:  March 14, 2016

Before:  GILMAN, WHITE, and STRANCH, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:**  Michael E. Piston, New York, New York, for Petitioner.  Nancy E. Friedman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Michael E. Piston, New York, New York, for Petitioner.  Nancy E. Friedman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

───────────────

**OPINION**

───────────────

  RONALD LEE GILMAN, Circuit Judge.  Petitioner Noor J. Sakhawati, a native and citizen of Bangladesh, was granted asylum and withholding of removal by an immigration judge (IJ) in 2006 after testifying to being kidnapped, forced to marry, and targeted for promoting feminist political views inside Bangladesh.  In 2007, the Department of Homeland Security

(DHS) appealed the IJ's grant of asylum to the Board of Immigration Appeals (BIA) and moved to reopen the proceedings, alleging that it had uncovered new information showing that Sakhawati's story was fraudulent. The BIA granted the motion. On remand, the IJ reversed his original ruling, denied Sakhawati's claims for relief, and ordered her removed to Bangladesh.

Sakhawati has appealed, arguing that the BIA abused its discretion in granting DHS's motion to reopen because the documents proffered by DHS were previously available and could have been discovered and presented at her prior hearing. For the reasons set forth below, we **GRANT** Sakhawati's petition for review, **VACATE** the BIA's grant of DHS's motion to reopen, and **REMAND** the case for proceedings consistent with this opinion.

## I. BACKGROUND

The decision rendered by the BIA in July 2008 provides the following relevant facts:

> The respondent, a native and citizen of Bangladesh, was admitted to the United States on or about October 12, 1998. In May 2003, the respondent traveled to Canada to seek refugee status. Canadian officials subsequently denied her asylum application, ordered her deported, and returned her to the United States on November 1, 2005. The DHS then issued [to] the respondent a Notice to Appear and charged her as being removable under section 237(a)(1)(A) of the [Immigration and Nationality] Act, 8 U.S.C. § 1227(a)(1)(B), and the respondent filed an asylum application on January 18, 2006.

> The respondent claims that she was persecuted because she was an active participant in the feminism movement in Bangladesh. While attending college she became involved in supporting a famous Bengali feminist writer, whom she called her mentor and spiritual guide. The respondent testified that in March 1997, while on her way home from college, she was kidnaped at gunpoint by four men, and forced into marriage with a wealthy, politically-connected man more than twice her age. . . . After the marriage she was kept locked in the house, forced to have sexual relations, and beaten for non-obedience. In October 1998, after 18 months of marriage, she escaped from Bangladesh with the help of her parents.

> In his May 22, 2006, decision the Immigration Judge determined that . . . the respondent, whom he deemed credible, had met her burden of proof establishing eligibility for asylum based on her claim of persecution resulting from her role as a feminist in Bangladesh. . . .

> Through their [October 2007] motion [to reopen], the DHS alleges that the respondent has committed fraud in her asylum application and seeks a remand to the Immigration Judge for a determination that she filed a frivolous asylum

application. The respondent entered the United States in 1998 using a passport issued to "Muhibun Nessa." According to a sworn statement submitted in response to the DHS's appeal brief, the respondent indicated that she "had lived in California for more than 5 years with a different name that I had assumed when I had first come to the United States in 1998." Subsequent to the Immigration Judge's May 22, 2006, grant of asylum to the respondent, the DHS uncovered evidence indicating that a woman named "Muhibun Nessa" was granted Canadian landed immigrant status on September 5, 1994, and that an alien file in that name (A77 159 057) was opened in January 1999 after an I-130 [Petition for Alien Relative] was filed on behalf of that individual by an alleged United States Citizen. According to the G-325A filed with the I-130, Muhiban Nessa indicated that she had lived in Canada from April 1995 to September 1998. . . .

Also included in the new evidence presented by DHS was a document stating that Sakhawati had been granted advance parole by the United States under the name "Muhibun Nessa" in 1999. DHS alleged that these documents show that Sakhawati and Nessa are the same person, and that Sakhawati had actually been residing in Canada during the time that she was allegedly being held captive in Bangladesh. Based on all of these documents, the BIA determined that "DHS has gathered a significant body of evidence indicating that the respondent and Muhibun Nessa are the same person, which would effectively serve to undermine the respondent's claim, which is predicated on her kidnaping and forced marriage in March 1997 in Bangladesh." The BIA, after concluding that this evidence was "new . . . and was previously unavailable to the government at the hearing below," granted DHS's motion to reopen. Because the BIA decided to remand on this basis, it declined to decide the merits of DHS's appeal from the underlying grant of asylum.

On remand, the IJ held three hearings in which he considered the additional evidence indicating that Sakhawati and Nessa are the same person. This evidence was uncovered by U.S. Customs and Border Protection (CBP) Enforcement Officer Raymond Eckert in October 2006—five months after Sakhawati had been granted asylum. Eckert had been conducting an unrelated investigation of another individual, Sakhawat Ullah. According to a California marriage registration, Ullah married a Bangladeshi citizen named Muhibun Nessa in 1998 and then attempted to sponsor Nessa for permanent-resident status in the United States. At Ullah's trial in October 2006, Eckert noticed the presence of a female who appeared to resemble the individual depicted in Nessa's alien file. But this individual referred to herself as "Noor," not as

"Muhibun." He then conducted a registration check of the woman's license plate and found that her car was registered to a "Noor J. Sakhawati." Using this name, Eckert ran "routine record checks, including checks of immigration databases, and found that there was an existing alien file" under Sakhawati's name. After comparing the alien files of both Muhibun Nessa and Noor Sakhawati, including photographs and fingerprints, Eckert concluded that "the aliens identified in the two files were the same person."

Sakhawati's counsel, in response to Eckert's testimony, argued that the evidence on which Eckert's conclusion relied was neither new nor previously unavailable because Sakhawati had "consistently maintained" that Muhibun Nessa was her assumed identity from 1998 to 2003. He pointed to two occasions in which Sakhawati informed DHS that she had used the Nessa alias. The first was in a sworn interview with a CBP officer in November 2005, when Sakhawati informed the officer that she had entered the United States using Nessa's name:

CBP OFFICER: What documents did you present for inspection?

SAKHAWATI: A Bangladeshi passport and a paper.

CBP OFFICER: What was the name on those documents?

SAKHAWATI: Muhibun Nessa.

Next, on April 3, 2006, Sakhawati provided to DHS an updated asylum application that specifically listed the name "Muhibun Nessa" as an alias. Sakhawati also testified to using an alias to illegally enter the United States during her original asylum hearing. Her counsel thus argued that the "[g]overnment had this information" but "failed to explore all facts and details of [Sakhawati's] identity during the initial asylum hearing." Had it done so, her counsel contended, it "would have discovered the existence" of Nessa's alien file.

Regarding the factual discrepancies in her story, Sakhawati testified that the Canadian immigration documents showing that a "Muhibun Nessa" lived in Canada from 1995–1998 were not hers; instead, they belonged to the "real" Muhibun Nessa who, according to Sakhawati, is Sakhawat Ullah's wife. Sakhawati contended that Ullah is actually her cousin, and that he prepared the fraudulent documents under his wife's name to help Sakhawati gain entry to the United States. Furthermore, Sakhawati denied ever working or living in Canada at the addresses

provided to DHS in her biographic information, claiming that Ullah included that information in her application without her knowledge. She also claimed that she had never met Nessa and did not know anything about her. Sakhawati thus maintained that her original story was credible and that she was present inside Bangladesh during the time that the "real" Nessa was in Canada. As support for this claim, she submitted affidavits from her parents and an uncle in Bangladesh, as well as documents from a women's college in Bangladesh allegedly verifying her enrollment.

The IJ issued a new decision in December 2013 in which he found that Sakhawati's testimony was not credible and that she had filed a "frivolous" asylum application. (In the lingo of immigration law, a fabricated application may be deemed "frivolous," which has the effect of permanently barring a petitioner from ever receiving immigration benefits. *See* 8 C.F.R. § 1208.20 (defining a "frivolous" application as "deliberately fabricated"); *see also* 8 U.S.C. § 1158(d)(6) ("If . . . an alien has knowingly made a frivolous application for asylum . . . , the alien shall be permanently ineligible for any benefits under this chapter . . . .").) Accordingly, the IJ denied Sakhawati's application for asylum and withholding of removal and ordered her removed to Bangladesh. The BIA affirmed the IJ's decision in May 2015. Sakhawati now petitions for review.

## II. ANALYSIS

### A. Standard of review

Because "[t]he decision to grant or deny a motion to reopen . . . is within the discretion of the [BIA]," we review the grant of a motion to reopen under the abuse-of-discretion standard. *Haddad v. Gonzales*, 437 F.3d 515, 517 (6th Cir. 2006) (quoting 8 C.F.R. § 1003.2(a)) (internal quotation marks omitted) (ellipsis in original); *accord Ramon-Sepulveda v. INS*, 743 F.2d 1307, 1309 (9th Cir. 1984) (applying the abuse-of-discretion standard to the grant of a motion to reopen). An abuse of discretion occurs when the BIA's decision "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005) (internal quotation marks omitted).

**B.      Motions to reopen**

Despite this seemingly deferential standard of review, the Code of Federal Regulations (C.F.R.) provides that a motion to reopen "shall not be granted unless it appears to the [BIA] that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1). An identical standard governs motions to reopen brought before an IJ instead of the BIA. *See id.* § 1003.23(b)(3). Under either scenario, the standard is conjunctive. *Huang v. Ashcroft*, 113 F. App'x 695, 698 (6th Cir. 2004) (requiring that "the new evidence must be material *and* not available *and* not discoverable at the previous hearing") (emphasis in original). The Supreme Court, in determining the applicable standard of review, noted that the "regulations . . . plainly disfavor motions to reopen." *INS v. Abudu*, 485 U.S. 94, 110 (1988). It analogized motions to reopen to motions for a new trial in a criminal case on the basis of newly discovered evidence, where "the moving party bears a heavy burden" in order to prevail. *Id.*

Under the applicable regulations, a party may file a motion to reopen while an appeal is pending before the BIA. *See* 8 C.F.R § 1003.2(c)(4). Such a motion "may be deemed a motion to remand for further proceedings," *id.*, which is the type of motion at issue in this case. DHS has the authority to file a motion to reopen regardless of any "time and numerical limitations" when it is based on fraud or criminal activity. *See id.* § 1003.2(c)(3). But despite this authority, "no part of the regulation exempts DHS from the requirement that a party seeking to reopen proceedings must show that the evidence it offers was not available and could not have been discovered or presented at the former hearing." *Hailemichael v. Gonzales*, 454 F.3d 878, 883 (8th Cir. 2006) (citation and internal quotation marks omitted).

We must therefore determine whether DHS's proffered evidence meets the unavailability and undiscoverability requirements delineated in 8 C.F.R. § 1003.2(c)(1). The weight of authority, both within this circuit and without, strictly construes these regulatory requirements. *See Huang*, 113 F. App'x at 698; *Allabani v. Gonzales,* 402 F.3d 668, 675 (6th Cir. 2005); *Ivanov v. Gonzales*, 487 F.3d 635, 639 (8th Cir. 2007) (holding that DHS's presentation of a false birth certificate was "not sufficient under controlling regulations to permit reopening" of the proceeding); *Hailemichael*, 454 F.3d at 883; *Ramon-Sepulveda*, 743 F.2d at 1310 ("We have

strictly construed the requirement that the evidence could not have been discovered or presented at the [prior] hearing." (internal quotation marks omitted)).

### 1. The evidence purporting to show that Nessa and Sakhawati are the same person existed in DHS's records and was therefore available at the time of the prior hearing

We first consider whether the evidence in question was available at the time of Sakhawati's previous hearing. This court has employed a strict standard when considering what evidence meets this availability requirement. *See Trujillo-Roque v. Lynch*, No. 15-3027, 2015 WL 5973371, at *2 (6th Cir. Oct. 15, 2015) (holding that news reports and caselaw cited by the petitioner in support of a motion to reopen were available prior to the denial of the petitioner's direct appeal); *Hyzoti v. Holder*, 517 F. App'x 354, 356–57 (6th Cir. 2013) (finding that news articles that predated the grant of asylum were available to the petitioner and could have been presented at the prior hearing); *Qeraxhiu v. Gonzales*, 206 F. App'x 476, 481 (6th Cir. 2006) (noting that "difficulties in communicating," which prevented the collection of affidavits in support of a petitioner's asylum claim, did not render the evidence previously unavailable at the time of the petitioner's initial hearing); *Allabani*, 402 F.3d at 675 (holding that an attorney's failure to present photographs and documents supporting his client's claim of political persecution did not qualify as previously unavailable evidence that warranted the reopening of proceedings).

Here, but for the investigative oversight of DHS, the documents purporting to show that Sakhawati and Nessa are the same person would have been considered by the IJ. As an initial matter, DHS does not dispute that Muhibun Nessa's alien file was created in 1999. It was therefore available in DHS's records prior to Sakhawati's 2006 asylum hearing. The availability of the evidence is reinforced by the simple fact that Officer Eckert determined that Sakhawati and Nessa are the same person through a "routine check[]" of immigration records, utilizing the same information available to DHS attorneys during Sakhawati's original proceedings. The only new development was that Officer Eckert pulled the alien files of both Muhibun Nessa and Noor Sakhawati and compared their contents; the files themselves were not new or unavailable. In sum, given that Nessa's alien file existed and was in DHS's possession at the time of

Sakhawati's original hearing, we conclude that it did not meet the unavailability requirement set forth in 8 C.F.R. § 1003.2(c)(1).

### 2. DHS was on notice that Sakhawati used the Nessa alias, and therefore it could have discovered the existence of the Nessa file through the exercise of due diligence

We next consider the question of whether the evidence that existed in DHS's own records could have been discovered and presented at the prior hearing. *See* 8 C.F.R. § 1003.2(c)(1). Applicable caselaw has consistently held that evidence existing at the time of the prior hearing that could have been discovered through the exercise of due diligence does not satisfy the standard for a motion to reopen. *See, e.g., Fongwo v. Gonzales*, 430 F.3d 944, 947 (8th Cir. 2005) (holding that a motion to reopen may be granted "only if the new evidence presented 'could not by the exercise of due diligence have been discovered earlier'" (quoting *Krougliak v. INS*, 289 F.3d 457, 460 (7th Cir. 2002))).

This same standard has been found applicable even when the government is the party seeking to reopen the proceeding. In *Ivanov v. Gonzales*, 487 F.3d 635 (8th Cir. 2007), for example, the petitioners claimed that they were persecuted in the Republic of Georgia on the basis of their non-Georgian nationalities. *Id.* at 637. The IJ granted their application for asylum. *Id.* Three days later, DHS moved to reopen the proceedings and to terminate the grant of asylum based on information that it had obtained from the U.S. Embassy in Georgia indicating that one of the petitioners' birth certificates was false. *Id.* at 638. DHS acknowledged that it did not follow its "standard investigative procedures" in which documents "would be sent overseas for verification." *Id.* at 637.

The Eighth Circuit vacated the IJ's grant of the motion to reopen, concluding that the evidence of the birth certificate's falsity was "not sufficient" to reopen the proceeding. *Id.* at 639. It further noted that "DHS acknowledged . . . that a document comparison of the type eventually conducted is a standard agency procedure, but for unknown reasons, the investigation had not been completed in the Ivanovs' case." *Id.* The court also observed that, "[w]hile we appreciate that DHS's workload compels the judicious use of its limited investigative resources,

this fact cannot excuse the agency from complying with the regulatory requirements for motions to reopen." *Id*.

The Ninth Circuit came to the same conclusion in *Ramon-Sepulveda v. INS*, 743 F.2d 1307 (9th Cir. 1984), when it held that the government's discovery of an individual's Mexican birth certificate, which showed that the individual was not a U.S. citizen, was not enough to reopen proceedings. *Id*. at 1309-10. Even though the birth certificate was uncovered later, "there [was] no indication . . . that the birth certificate *could not have been* discovered before the [prior] hearing." *Id*. at 1310 (emphasis in original). The court further determined that there was "no indication in the record that the agency's pre-hearing investigation was hampered." *Id*.

Like *Ramon-Sepulveda*, there is no indication that DHS's investigation was hampered in this case. As described above, the Nessa file was undisputedly in existence and in DHS's possession at the time of Sakhawati's original hearing in 2006. Of equal importance is the fact that DHS was repeatedly put on notice that Sakhawati had entered the United States using the alias "Muhibun Nessa" and had continued to use the same alias over the course of several years. This should have prompted DHS to fully investigate Sakhawati's use of the alias, an investigation which, through the exercise of due diligence, would have turned up the existence of the Nessa file. The fact that DHS did not uncover the documents until after the grant of asylum "cannot excuse [it] from complying" with the requirements set forth in 8 C.F.R. § 1003.2(c)(1). *See Ivanov*, 487 F.3d at 639.

There has been no attempt by the government to distinguish the facts in this case from *Allabani*, *Ivanov*, or *Ramon-Sepulveda*. It instead claimed for the first time at oral argument that the information showing that the Nessa and Sakhawati files cover the same person could not have been discovered because (1) Sakhawati's background checks would not have revealed the existence of Nessa's alien file, and (2) DHS had "no reason" to suspect that Sakhawati was committing fraud and therefore did not look for an alien file under the provided alias.

We have no reason to tread into a bureaucratic thicket to discern what specific search functions DHS utilizes when conducting background checks on asylum applicants. The government's brief is silent on the matter and, at oral argument, its attorney could not describe

exactly how asylum applications are investigated or whether DHS has the technological capacity to access an alien file solely by entering an individual's provided alias (despite the fact that this appears to be precisely the means employed by Eckert when he discovered the evidence of Sakhawati's double identity). *See* Dep't of Homeland Sec., Privacy Impact Assessment 5–6 (2007), *available at* http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_uscis_cis.pdf (noting that an individual's immigration-related information "can be retrieved" using several methods, including searching by name, alias, or alien number). This matters little, however, because the dispositive question in this case is not *how* the government accessed Nessa's alien file (which it eventually did through a "routine" check), but whether it *could have*, with the exercise of due diligence, accessed Nessa's alien file at the time of Sakhawati's original hearing.

The government's reasons for its failure to investigate are simply not compelling. Not only did Sakhawati admit to using an alias, including the explicit admission on her asylum application, but she also provided biometric information that would have enabled DHS to discover the existence of a second identity. A transcript of Sakhawati's original asylum hearing in 2006 indicates that she had completed a biometric screening in mid-March of that year. The government does not dispute this fact. Using Sakhawati's biometric data, including her fingerprints, DHS could have discovered the existence of the second alien file through its routine background checks. We base this conclusion on information compiled by U.S. Citizenship and Immigration Services (USCIS), the DHS arm charged with processing asylum applications. This information states that "biometrics . . . allow USCIS to confirm [an applicant's] identity and run required background and security checks." USCIS, *Preparing for Your Biometric Servs. Appointment*, Official Website of the Dep't of Homeland Sec., www.uscis.gov/forms/forms-information/preparing-your-biometric-services-appointment (last updated Dec. 16, 2015). As part of the verification process, DHS "[c]hecks against the entire database of all the fingerprints the [DHS] has collected . . . to determine if a person is using an alias and attempting to use fraudulent identification." Office of Biometric Identity Mgmt. Identification Servs., *How Biometrics Assure Identity*, Official Website of the Dep't of Homeland Sec., www.dhs.gov/obim-biometric-identification-services (last updated Feb. 10, 2016).

Moreover, DHS specifically informed the IJ that it had completed all of the requisite background checks—which include the above-mentioned biometric screening—pursuant to DHS's own regulatory requirements. *See* 8 C.F.R. § 1003.47(g) ("In no case shall an immigration judge grant an application for immigration relief that is subject to the conduct of identity, law enforcement, or security investigations . . . until after DHS has reported . . . that the appropriate investigations or examinations have been completed. . . .") The assurance that DHS provided to the IJ is particularly puzzling because the entire basis for such background checks is to confirm an individual's identity and whether he or she is "attempting to use fraudulent identification." Nor does the government's argument square with the plain fact that Eckert used a fingerprint comparison to conclude that the Nessa and Sakhawati files document the same person.

We acknowledge that the facts in the present case differ from our prior cases in one notable respect: here, the government, rather than the petitioner, is the party seeking to reopen the proceeding. But this procedural peculiarity provides no basis to depart from the strict standard set forth in *Allabani*, *Hyzoti*, and *Trujillo-Roque*, where we held that evidence existing at the time of the prior hearing is not sufficient to reopen proceedings under 8 C.F.R. § 1003.2(c)(1). DHS benefits from this strict requirement when, as in the majority of cases, it applies to petitioners seeking immigration relief. What is sauce for the goose is sauce for the gander. DHS cannot avoid being held to an equally strict standard. As demonstrated by Eckert's own actions, a DHS official exercising due diligence could have readily discovered the existence of the Nessa alien file and presented it at Sakhawati's original hearing.

In sum, because the evidence relied on by DHS was already present in its records and because DHS was given notice that Sakhawati had used the alias Muhibun Nessa, the evidence was available and could have been discovered with due diligence prior to Sakhawati's original hearing. We therefore hold that the BIA abused its discretion in granting DHS's motion to reopen.

**C.     DHS may have alternate means of addressing fraud in asylum applications**

Although the BIA erred in granting DHS's motion to reopen under the circumstances present here, this does not necessarily leave DHS powerless to act when it finds evidence of fraud.  We note that several of our sister circuits that have vacated the grant of a motion to reopen have contemporaneously acknowledged that DHS may have authority to initiate new removal proceedings.  *See Ivanov v. Gonzales*, 487 F.3d 635, 639–40 (8th Cir. 2007) (concluding that granting a motion to reopen was improper based on the existence of a fraudulent birth certificate, but noting that the evidence could apparently be presented in a new proceeding); *Diallo v. Gonzales*, 447 F.3d 1274, 1279–80 (10th Cir. 2006) (affirming the termination of asylum originally granted by the BIA after DHS initiated new removal proceedings based on its discovery that the petitioner had not disclosed his use of an alias on his asylum application); *Johnson v. Ashcroft*, 378 F.3d 164, 172 (2d Cir. 2004) (holding that the BIA erred in remanding the case to the IJ for the submission of evidence of additional convictions, but explaining that DHS could seek to proffer such evidence in a new proceeding without deciding whether a new proceeding would be barred by res judicata).  So even though DHS is prohibited by 8 C.F.R. § 1003.2(c)(1) from reopening the original asylum proceeding against Sakhawati, it can seek to initiate a new proceeding against her based on the allegedly fraudulent application.  We have no need to decide whether any new proceedings would be barred by res judicata (as Sakhawati contended at oral argument) or on any other basis.

### III.    CONCLUSION

For all of the reasons set forth above, we **GRANT** Sakhawati's petition for review, **VACATE** the BIA's decision, and **REMAND** the case for further proceedings consistent with this opinion.