RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0082p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――



WALID ABDULAHAD,

*Petitioner*,

*v.*

MERRICK B. GARLAND, Attorney General,

*Respondent*.

No. 22-3743

―――――――――――

On Petition for Review from the Board of Immigration Appeals.
No. A 075 056 571.

Argued:  October 24, 2023

Decided and Filed:  April 11, 2024

Before:  MOORE, GIBBONS, and STRANCH, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:**  Nadia Anguiano, Jeremy Ruppert, UNIVERSITY OF MINNESOTA, Minneapolis, Minnesota, for Petitioner.  Gregory A. Pennington, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Nadia Anguiano, Jeremy Ruppert, UNIVERSITY OF MINNESOTA, Minneapolis, Minnesota, Russell Abrutyn, ABRUTYN LAW, PLLC, Berkley, Michigan, for Petitioner.  Gregory A. Pennington, Jr., Paul Fiorino, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

MOORE, J., delivered the opinion of the court in which STRANCH, J., joined. GIBBONS, J. (pp. 26–34), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Walid Abdulahad petitions for review of the Board of Immigration Appeals' (the "Board") denial of his motion to reopen based on changed country conditions in Iraq.  The Board denied the motion to reopen because it found that Abdulahad's motion evidence was cumulative of evidence submitted with prior motions to reopen, Abdulahad had not established a particularized risk of torture sufficient to establish prima facie eligibility for Deferral of Removal under the Convention Against Torture ("DCAT"), and Abdulahad had not established that each step in his causal-chain claim was more likely than not to occur.  For the reasons set forth below, we **GRANT** the petition, **VACATE** the Board's decision, and **REMAND** the case to the Board for proceedings consistent with this opinion.

## I. BACKGROUND

Abdulahad was born in Baghdad, Iraq, and, in 1991, he fled the country with his family. Administrative Record ("A.R.") at 1237, 1239 (11/7/2017 Hr'g Tr. at 81, 83).  In 1997, Abdulahad and his family entered the United States and, in 2000, Abdulahad obtained legal permanent resident status.  A.R. at 2475 (I-94 Permit at 1); A.R. at 2473 (LPR Approval at 1).  In September 2003, Abdulahad was arrested in Aruba for attempting to transport approximately 500 grams of cocaine.  A.R. at 2734–35 (Aruba Crim. R. at 8–9).  Thereafter, an Aruban criminal court found him guilty in absentia.  *Id.* at 2729 (Aruba Crim. R. at 3).  Based on that criminal judgment, the U.S. Immigration and Naturalization Service instituted removal proceedings against Abdulahad.  A.R. at 2896 (Charges of Deportability at 1).  Abdulahad did not appear at an August 3, 2006, hearing in immigration court and, therefore, the immigration judge ("IJ") ordered Abdulahad removed in absentia.  A.R. at 1166–68 (8/3/2006 Hr'g Tr. at 11–13).  Since then, Abdulahad has remained in the United States under supervision.  *See* A.R. at 2130 (DHS Order of Supervision at 1).

On June 19, 2017, Abdulahad filed an emergency motion to stay removal and a motion to reopen his removal proceedings based on changed country conditions in Iraq.  A.R. at 2083–103

(6/19/2017 Mot. to Reopen at 1–21); A.R. at 2835–44 (Emergency Mot. to Stay at 1–10). On August 16, 2017, the IJ granted Abdulahad's motion to reopen, finding that Abdulahad was entitled to an evidentiary hearing because he had established prima facie eligibility for DCAT. A.R. at 2783, 2786 (8/16/2017 IJ Order at 7, 10). Abdulahad then presented testimony from Dr. Shaul M. Gabbay and himself and proposed twenty exhibits supporting his application. A.R. at 1192–1223, 1230–56 (11/7/2017 Hr'g Tr. at 36–67, 74–100); A.R. at 1273–1304 (2/18/2018 Hr'g Tr. at 116–47); A.R. at 1468–71 (Abdulahad Ex. List at 2–5).

On February 28, 2018, after two days of hearings, the IJ denied Abdulahad's application for DCAT. A.R. at 1152 (2/28/2018 IJ Order at 15). The IJ determined that Abdulahad did not demonstrate that it was more likely than not that he would be tortured based on his status as a Chaldean Christian or his ties to the United States. *Id.* at 1148–50 (2/28/2018 IJ Order at 11–13). The IJ reasoned that extremist groups, specifically Da'esh,[1] that historically persecuted Christians had been "routed from all but a small portion of Iraq." *Id.* at 1148 (2/28/2018 IJ Order at 11) (quotations omitted). The IJ also concluded that, although the Popular Mobilization Forces ("PMFs") "ha[d] perpetrated human rights abuses against civilians, including Christians," they "largely [sought] to defeat Da'esh" and therefore, would not pose a threat to Abdulahad. *Id.* at 1149 (2/28/2018 IJ Order at 12). More specifically, the "PMF members primarily detain, question, and potentially harm those suspected of maintaining ties to Da'esh," but, because Abdulahad "has lived outside of Iraq for a majority of his life," the IJ concluded that "it is therefore unlikely PMF members would suspect [that Abdulahad had] prior involvement with Da'esh." *Id.* As it related to Abdulahad's fear of torture based on his ties to the United States, the IJ found that these fears were unfounded because "significant evidence in the record leads to the opposite conclusion." *Id.* at 1150 (2/28/2018 IJ Order at 13). The IJ reasoned that:

> Returnees to Iraq may be detained by the PMF *only if* they have ties to Da'esh. Respondent's long residence in the United States, which he uses to support his assertion of being westernized – rather than make him a target of the PMF – essentially exonerates him from any fear of detention or harm. Iraqi Christians in particular, such as respondent, should not be concerned about their "westernization" because the fact that they were in the West almost clears them

---

[1]The term "Da'esh" refers to the Islamic State in Iraq, or ISIS. *See* A.R. at 1479 (Dr. Gabbay Rep. at 7).

with certainty of any connection to Da'esh, and [Dr.] Rubin emphasizes that Western influences are not unwelcome or uncommon in Iraq.

*Id.* Finally, the IJ concluded that Abdulahad had not established that the Iraqi government acquiesced in the PMFs' human rights abuses because "the Iraqi government [was] investigating abuses by the PMF[s]" and the government expert, "Dr. Rubin[,] contends that the end of the war against Da'esh has meant increasing accountability for the PMF[s]." *Id.* at 1149–50 (2/28/2018 IJ Order at 12–13).

Abdulahad appealed the IJ's order to the Board and filed a motion to remand the case based on new evidence. A.R. at 1101–03 (3/27/2018 Notice of Appeal at 1–3); A.R. at 877–915 (6/20/2018 Br. & Mot. to Remand at 1–39). On November 20, 2018, the Board affirmed the IJ's decision and denied Abdulahad's motion to remand. A.R. at 717, 725 (11/20/2018 BIA Dec. at 1, 9). Abdulahad then petitioned this court for review. *See Abdulahad v. Barr*, 838 F. App'x 126, 128 (6th Cir. 2020). On December 19, 2018, Abdulahad filed a motion to reopen with the Board, which the Board denied on May 24, 2019. A.R. at 666–81 (Mot. to Reopen & Reconsider at 1–16); A.R. at 514–16 (5/24/2019 BIA Dec. at 1–3). Abdulahad then filed a petition for this court to review the Board's denial of his motion to reopen, which this court consolidated with the first petition. *See Abdulahad*, 838 F. App'x at 129. On November 25, 2020, this court denied both petitions for review. *Id.* at 130–36. As it related to the Board's denial of the motion to reopen, the prior panel determined that "Abdulahad fail[ed] to point to specific facts that the BIA failed to accept as true for the purposes of the motion to reopen." *Id.* at 137.

On January 6, 2021, Abdulahad filed a new motion to reopen with the Board. A.R. at 277–94 (1/6/2021 Mot. to Reopen at 1–18). Abdulahad argued that six of his characteristics "individually or in the aggregate, make it more likely than not that he will be tortured by or with the acquiescence of Iraqi government officials." *Id.* at 277 (1/6/2021 Mot. to Reopen at 1). On July 5, 2021, Abdulahad submitted a supplement to his January 2021 motion to reopen that included updated country condition reports and other evidence. A.R. at 148–52 (7/5/2021 Suppl. to Mot. to Reopen at 1–5). On July 20, 2021, the Board denied Abdulahad's January 2021 motion to reopen. A.R. at 253 (7/20/2021 BIA Dec. at 1). In doing so, the Board did not

consider the updated country condition reports that Abdulahad submitted with his July 2021 supplement. *Id.* at 253–56 (7/20/2021 BIA Dec. at 1–4). Abdulahad petitioned this court for review of the Board's decision. A.R. at 244–45 (1/28/2022 6th Cir. Order at 1–2). We granted the government's motion to remand the case so that the Board could consider the evidence that Abdulahad had included in his July 2021 supplement. *Id.*

On remand, Abdulahad filed a new motion to reopen that included updated country condition reports and other evidence. A.R. at 67 (6/9/2022 Mot. to Reopen at 1). Abdulahad also resubmitted the July 2021 supplement in order to "complete the record" and incorporated by reference the materials submitted with his January 2021 motion to reopen. *Id.*

On August 24, 2022, the Board, in a single-judge order, denied Abdulahad's motion to reopen. A.R. at 3 (8/24/2022 BIA Dec. at 1). The Board found that much of the evidence that Abdulahad submitted was not "new" because he submitted it with his prior motions to reopen or that it was "cumulative" of evidence Abdulahad included with the prior motions to reopen. *See, e.g.*, *id.* at 5–7 (8/24/2022 BIA Dec. at 3–5). The Board then reasoned that "the evidence largely reflects a continuation of the development of the status and activities of the PMFs and the continued suspicion of those perceived to have a connection to the United States." *Id.* at 7 (8/24/2022 BIA Dec. at 5). And, although the Board acknowledged that "the evidence reflects that the PMFs generally commit gross human rights violations, including torture, . . . and that Christians remain at high risk of persecution in Iraq," ultimately the Board concluded that Abdulahad did not establish that there was "a reasonable likelihood that . . . any persecutor or Iraqi official would specifically intend to inflict severe pain or suffering on him." *Id.*

## II.  JURISDICTION

We have jurisdiction over this petition because the arguments presented on appeal relate to questions of law. 8 U.S.C. § 1252(a)(2)(D) ("Nothing in subparagraph (B) or (C), or in any other provision of this chapter . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review."); *see also Mata v. Lynch*, 576 U.S. 143, 147 (2015) ("[C]ircuit courts have jurisdiction" over "appeals from the Board's denial of a motion to reopen a removal proceeding."); *Sanchez-*

*Gonzalez v. Garland*, 4 F.4th 411, 413–14 (6th Cir. 2021) ("We agree that we have jurisdiction under § 1252(a)(2)(D) to review the legal questions involved in Sanchez's motion to reopen.").

## III.  ANALYSIS

### A.  Standard of Review

We review for abuse of discretion the Board's denial of a motion to reopen.  *Bi Feng Liu v. Holder*, 560 F.3d 485, 489 (6th Cir. 2009).  "[L]egal issues are reviewed de novo."  *Gafurova v. Whitaker*, 911 F.3d 321, 325 (6th Cir. 2018) (quoting *Harchenko v. INS*, 379 F.3d 405, 409 (6th Cir. 2004)).  The Board abuses its discretion if its decision "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group."  *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005) (quoting *Balani v. I.N.S.*, 669 F.2d 1157, 1161 (6th Cir. 1982) (per curiam)).  "The Board's discretion is broad but it is not unlimited. It may not exercise its discretion in a way that is arbitrary, irrational or contrary to law.  Cursory, summary, or conclusory statements are inadequate."  *Daneshvar v. Ashcroft*, 355 F.3d 615, 625–26 (6th Cir. 2004) (citations omitted).

The Board must also "'analyze and explain the basis on which it decides against [the petitioner],' meaning it must actually consider the evidence and the arguments put forth by the [petitioner]."  *Marqus v. Barr*, 968 F.3d 583, 592 (6th Cir. 2020) (quoting *Preçetaj v. Sessions*, 907 F.3d 453, 459 (6th Cir. 2018)).  We review only "the basis articulated in the decision and [we] may not assume that the Board considered factors that it failed to mention in its opinion."  *Preçetaj*, 907 F.3d at 458 (quoting *Daneshvar*, 355 F.3d at 626).

### B.  Motion to Reopen Standard

An applicant for immigration relief is typically limited to one motion to reopen that must be filed within ninety days of the "final administrative decision . . . in the proceedings sought to be reopened."  8 C.F.R. § 1003.2(c)(2).  There is an exception to this rule for motions to reopen "based on changed circumstances arising in the . . . country to which deportation has been ordered, if such evidence is material and was not available and would not have been discovered

or presented at the previous hearing." *Id.* § 1003.2(c)(3)(ii).  Abdulahad's most recent motion to reopen was filed beyond the ninety-day deadline, and therefore he must meet the requirements of this exception.

Abdulahad argues that the Board abused its discretion in three ways.  First, Abdulahad argues that the Board "failed to apply long-established legal standards to determine whether Mr. Abdulahad's motion evidence 'demonstrates a material change in country conditions that would justify reopening.'"  Pet'r Br. at 26 (footnote omitted) (quoting *Matter of S-Y-G-*, 24 I. & N. Dec. 247, 253 (BIA 2007)).  Second, Abdulahad argues that the Board "fail[ed] to analyze Mr. Abdulahad's aggregate risk of torture in Iraq," as required by "its own binding precedent."  *Id.* at 34.  Third, Abdulahad argues that, even if the Board applied the correct legal standards, it "fail[ed] to consider all aspects of [his] claim or articulate a reasoned basis for" finding that he did not establish prima facie eligibility for DCAT.  *Id.* at 41.  In response, the government argues that the Board did not abuse its discretion and, even if its reasoning was inadequate in some way, any errors were harmless.  *E.g.*, Resp't Br. at 15–16, 34–35.

### 1. Changed Country Conditions

Abdulahad makes two arguments of legal error as it relates to the Board's analysis of changed country conditions.[2]  First, Abdulahad argues that the Board did not, as required by its own precedent, compare the evidence he submitted with his motion to reopen to the country conditions evidence presented with his application for DCAT relief.  Pet'r Br. at 26.  Instead, Abdulahad argues that the Board incorrectly compared the evidence submitted with his most recent motion to reopen with the evidence submitted with his prior motions to reopen.  *Id.*

---

[2]The government argues that Abdulahad has "waived any challenge to [the] Board's holding that the motion failed to demonstrate materially changed country conditions" because Abdulahad did not argue "how the evidence in the record shows changed country conditions."  Resp't Br. at 18.  To the extent that the government suggests that Abdulahad did not argue that the Board's errors prejudiced him, this is incorrect. *See, e.g.*, Pet'r Br. at 23 ("Considering that numerous Immigration Judges . . . have granted nondiscretionary CAT protection after examining the same evidence the BIA failed to properly compare in this instance, the BIA's legal errors resulted in clear prejudice to Mr. Abdulahad.").  To the extent that the government suggests that Abdulahad has waived any challenge to the factual findings underlying the Board's decision, any such waiver is irrelevant because we have jurisdiction to review only legal questions and constitutional challenges. *See* 8 U.S.C. § 1252(a)(2)(D) ("Nothing in subparagraph (B) or (C), or in any other provision of this chapter . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review.").

Second, Abdulahad contends that the Board used an incorrect legal standard to assess whether the evidence offered was material.  *Id.*

### a.  New or Cumulative

A petitioner seeking to reopen their immigration case based on changed country conditions can do so if the "evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing."  8 C.F.R. § 1003.2(c)(1). When considering whether evidence was not previously available, we define "at the former hearing," *id.*, as at the time of the merits hearing, as opposed to evidence submitted on appeal or with a motion to reopen, because this court and "the [Board] normally do[] not accept and consider new evidence on appeal," *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 317 (6th Cir. 2018) (assessing whether certain evidence submitted with the motion to reopen "could not have [been] discovered" before the merits hearing).  Similarly, when considering whether the evidence is material in terms of changed country conditions, we compare the country conditions as they existed at the time that the motion to reopen was filed and the country conditions as they existed at the time of the merits hearing.  *See Bi Feng Liu*, 560 F.3d at 491 ("In determining whether evidence accompanying a motion to reopen demonstrates a material change in country conditions that would justify reopening, [the Board] compare[s] the evidence of country conditions submitted with the motion to those that existed at the time of the merits hearing below." (quoting *Matter of S-Y-G*, 24 I. & N. Dec. at 253)).

Here, the Board repeatedly and explicitly compared evidence that Abdulahad submitted with his most recent motion to reopen to evidence submitted with his prior motions to reopen. *See, e.g.*, A.R. at 4 (8/24/2022 BIA Dec. at 2) ("In the motion filed on January 14, 2021, the respondent expresses the same fear of torture that he claimed in his first motion to reopen filed on December 20, 2018."); *id.* at 5 (8/24/2022 BIA Dec. at 3) ("Because the respondent previously submitted the excerpt of the 2018: Iraq Country Reports with his prior request for reopening, the excerpt from this same report submitted with the instant motion is not 'new' evidence and is cumulative of evidence previously submitted."); *id.* at 6 (8/24/2022 BIA Dec. at 4) ("The respondent's argument that, though he is not a United States citizen, his implied status as an American will increase the risk of torture at the hand of Iraqi security forces and PMFs, is

not new, as he expressed such a fear in his prior motion to reopen."); *id.* ("[T]he 2019 declaration from Ms. Wille that was previously submitted with the respondent's prior motion to reopen also made the same assertions."); *id.* ("Mr. Smith's February 2020 declaration asserts that Iraqi deportees from the United States are at heightened risk of detention and torture upon return to Iraq, including threat of torture by Iran-backed PMFs, which was previously asserted in his April 2019 declaration."). Therefore, the Board incorrectly disregarded most of Abdulahad's evidence as cumulative or not new. *See, e.g.*, *Hernandez-Perez*, 911 F.3d at 317.[3]

The government suggests that the Board cited the correct legal standard and therefore, we should assume that the Board conducted the correct analysis. Resp't Br. at 34. In several places, however, the Board cites the correct legal standard while explicitly making the incorrect comparison. *See, e.g.*, A.R. at 5 (8/24/2022 BIA Dec. at 3) (citing *Matter of S-Y-G-* to support its conclusion that "[b]ecause the respondent previously submitted the excerpt of the 2018: Iraq Country Reports with his prior request for reopening, the excerpt from this same report submitted with the instant motion is not 'new' evidence and is cumulative of evidence previously submitted"). And, as outlined above, the Board explicitly compared the wrong evidence throughout its decision. Therefore, the Board abused its discretion by applying the incorrect legal standard. *See Daneshvar*, 355 F.3d at 625–26 ("The Board[] . . . may not exercise its discretion in a way that is . . . contrary to law.").

### b. Materiality

Next, Abdulahad argues that the Board "ignore[d] this Circuit's rule that changed country conditions can exist when persecution of an already-targeted group escalates" and improperly disregarded evidence as immaterial. Pet'r Br. at 26 (quoting *Pablo Lorenzo v. Barr*, 779 F. App'x 366, 375 (6th Cir. 2019)). The government responds that the Board "held that there was no material change," incremental or otherwise, and therefore, the Board did not apply an incorrect legal standard. Resp't Br. at 35.

---

[3]The dissent *agrees* that the Board used the incorrect legal standard throughout its opinion to disregard evidence as cumulative or not new. Dissent at 27 ("And the majority is correct that there are places where the Board compares Abdulahad's offered evidence to the evidence presented with his first motion to reopen . . . ."). Instead, the dissent contends that these errors were harmless. For the reasons explained in Part III.B.4, we cannot say that these errors were harmless.

Changed country conditions are material when the country "become[s] more hostile towards" a petitioner "or [their] group," *Yu Yun Zhang v. Holder*, 702 F.3d 878, 880 (6th Cir. 2012) (order) (quoting *Tan Wu Zhang v. Holder*, 385 F. App'x 546, 547 (6th Cir. 2010)), or when the "persecution of [the petitioner's] group has 'escalated' since [their] original immigration proceeding," *Pablo Lorenzo*, 779 F. App'x at 374 (quoting *Yu Yun Zhang*, 702 F.3d at 880). *See also Luhiso v. Barr*, 787 F. App'x 319, 323 (6th Cir. 2019) ("A change in circumstance is attributable to a country's conditions if the country as a whole becomes more hostile or dangerous."). "Change that is incremental or incidental does not" establish materially changed country conditions. *Matter of S-Y-G–*, 24 I. & N. Dec. at 257.

To support his argument, Abdulahad relies primarily on *Pablo Lorenzo*, 779 F. App'x 366 (6th Cir. 2019), whereas the government, for its part, relies primarily on *Jado v. Wilkinson*, 847 F. App'x 278 (6th Cir. 2021). In *Pablo Lorenzo*, we granted a petition for review and remanded the case so that the Board could "reconsider whether Pablo [Lorenzo] has demonstrated changed country conditions under the correct evidentiary and legal standards." 779 F. App'x at 368. We found that the Board's conclusion—that Pablo Lorenzo did not establish changed country conditions because "'the indigenous population's troubles [in Guatemala] took root during the 1980's civil war,' and the indigenous population has historically suffered discrimination and violence"—was based on a legal error. *Id.* at 375 (citation omitted). We reasoned that "[t]he mere fact that the indigenous population of Guatemala has long faced some level of discrimination would not preclude Pablo [Lorenzo] from demonstrating changed country conditions if he shows that persecution of the indigenous population materially intensified since his merits hearing." *Id.* In other words, the Board "erred by finding that the fact that indigenous Guatemalans have long faced discrimination categorically precludes Pablo [Lorenzo] from showing changed country conditions." *Id.*

Conversely, in *Jado*, we denied Jado's petition for review of the Board's denial of his motion to reopen. 847 F. App'x at 279. The Board had denied Jado's motion to reopen because he "had not shown that conditions in Iraq had materially changed" and the evidence showed "only incremental changes in Iraq, not materially changed conditions." *Id.* at 283. The Board considered specific pieces of evidence and concluded that the country conditions had not

significantly changed such that reopening was warranted. *Id.* We found that the Board did not abuse its discretion because "the evidence merely described 'incremental changes' that 'would be expected in the volatile atmosphere of contemporary Iraq,' not changes that were material to Jado's situation." *Id.* at 285. In other words, the Board applied the correct law and explained its decision in the context of the relevant facts.

Although the facts of *Jado*, like this case, involve the country conditions in Iraq, the pertinent comparison is in the Board's legal analysis. Here, similar to *Pablo Lorenzo*, the Board found that the evidence Abdulahad submitted, specifically the 2020 and 2021 country reports, "largely reflect[ed] a continuation of the general mistreatment that Christians (and religious and ethnic minorities) have faced in Iraq and that the decline of the Christian population in Iraq has been ongoing over nearly the past two decades." *Compare* A.R. at 5 (8/24/2022 BIA Dec. at 3), *with Pablo Lorenzo*, 779 F. App'x at 375 (stating that the Board denied the motion to reopen, in part, because "'the indigenous population's troubles [in Guatemala] took root during the 1980's civil war,' and the indigenous population has historically suffered discrimination and violence" (citation omitted)). This aspect of the analysis improperly relied on the fact that Christians "have long faced discrimination" in Iraq to support the conclusion that Abdulahad could not show changed country conditions and, therefore, this was in error. *Pablo Lorenzo*, 779 F. App'x at 375.

The Board further reasoned that evidence included in the declarations submitted by Abdulahad, particularly Mr. Smith's declaration, "largely reflect[ed] a continuation of the development of the status and activities of the PMFs and the continued suspicion of those perceived to have a connection to the United States, as well as continued risk to Christian and other minority populations in Iraq." A.R. at 7 (8/24/2022 BIA Dec. at 5). The Board also noted that Mr. Lattimer's updated declaration was "a continuation of conditions attested to in his prior declaration." *Id.* Although these aspects of the decision could be said more closely to parallel the reasoning in *Jado*, 847 F. App'x at 285, here the Board did not invoke the correct legal test—by citing the test or using the "incremental change" language—and did not explain *why* the "continuation of the development" of certain conditions, including hostility toward Christians and those with a connection to the United States, was immaterial. Therefore, it is difficult to

discern whether the Board relied on the improper assumption that "the fact that [a persecuted group has] long faced discrimination categorically precludes [a petitioner] from showing changed country conditions." *Pablo Lorenzo*, 779 F. App'x at 375. Without a more specific explanation, the Board has not provided a sufficient basis for this court to review this portion of its reasoning. *See Preçetaj*, 907 F.3d at 458 (stating that we "may not assume that the Board considered factors that it failed to mention in its opinion").

The dissent contends that "the Board need not invoke any magic words" and that the Board can "use the proper legal test without invoking the explicit language" of the test. Dissent at 29. On this point, we agree. The issue with the Board's analysis here is not simply that it did not use the incremental-change language, but rather it is that the Board failed to provide *any* reasoned explanation that reflected that it conducted the proper legal analysis. Our reference to the lack of incremental-change language is just an example—another example being the Board's failure to explain *why* the continuation of hostile conditions was immaterial—of what might have supported a conclusion that the Board used the correct legal test.

The dissent also posits that the Board found that there was "no material change in country conditions, as opposed to incremental change." Dissent at 30. This suggestion, however, relies on an analysis that the Board did not conduct.[4] Because "the Board's denial of relief may be affirmed only on the basis articulated in the decision," we will not hypothesize how the Board *could have* come to a particular conclusion. *Daneshvar*, 355 F.3d at 626.

---

[4]More specifically, the dissent argues that the Board's use of the phrase "continuation of the general mistreatment," A.R. at 5 (8/24/2022 BIA Dec. at 3), means the Board concluded that the hostile conditions did not materially change. Dissent at 29–30. This conclusion, however, pulls the phrase out of context and reads an analysis into the Board's lack of explanation. That hostile conditions continued over the course of two decades speaks to the *existence* of the hostilities but says nothing about the *intensity* of the hostilities. *See Pablo Lorenzo*, 779 F. App'x at 375 ("The mere fact that the indigenous population of Guatemala has long faced *some level of discrimination* would not preclude Pablo [Lorenzo] from demonstrating changed country conditions if he shows that persecution of the indigenous population *materially intensified* since his merits hearing." (emphasis added) (citations omitted)). Moreover, the dissent's reliance on *Akrawi v. Garland* is misplaced because that case only further supports our conclusion. No. 19-3896, 2022 WL 3681260, at *8 (6th Cir. Aug. 25, 2022) (finding that the Board adequately explained its materiality determination based on the Board holding that "[w]hile these more recent reports continue to reflect that Christians in Iraq may be facing harassment, abuse, and other harm in Iraq, these reports *do not denote a remarkable shift from the reports examined by the Immigration Judge*." (emphasis added) (internal quotation marks omitted)).

Accordingly, for the reasons explained above, the Board abused its discretion by applying the incorrect legal standard for assessing evidence of changed country conditions. The Board also failed to consider or explain adequately whether the "persecution of [Abdulahad's] group has 'escalated' since his original immigration proceeding." *Pablo Lorenzo*, 779 F. App'x at 374.

## 2. Aggregate Risk of Torture

Abdulahad next argues that the Board "violated its own binding precedent" because it did not assess his risk of torture in the aggregate. Pet'r Br. at 34–35. In response, the government does not cite any cases that suggest that the Board is not required to determine the applicant's aggregate risk of torture in these circumstances. Resp't Br. at 45–46. Instead, the government argues that there is nothing to suggest that the Board did not consider the risk of torture in the aggregate. *Id.* at 46.

Several other circuits have concluded that 8 C.F.R. § 1208.16(c)(3), which provides that "all evidence relevant to the possibility of future torture shall be considered," requires immigration courts to consider the aggregate risk of torture from all sources and for all reasons. *See Hamilton v. Whitaker*, 759 F. App'x 69, 71 (2d Cir. 2019) (stating that "the risk of torture must be assessed cumulatively," and that "[t]he CAT regulations . . . support this argument by requiring the agency to consider 'all evidence relevant to the possibility of future torture'" (quoting 8 C.F.R. § 1208.16(c)(3))); *Kamara v. Att'y Gen. of U.S.*, 420 F.3d 202, 213–14 (3d Cir. 2005) (finding that the Board abused its discretion because it failed properly to apply the regulations which "merely require[]" the petitioner "to demonstrate that the cumulative probability of torture by the two entities exceeds 50%"); *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972–73 (4th Cir. 2019) (adopting the rule that "risks of torture from all sources should be combined when determining whether a CAT applicant is more likely than not to be tortured in a particular country" because this "interpretation is most consistent with both the implementing regulations and our treaty obligations not to return individuals to a country where they face a substantial risk of torture"); *Nyandwi v. Garland*, 15 F.4th 836, 839 (7th Cir. 2021) ("We see no reason to disagree with the parties, the [Board], or other circuits, so we adopt the aggregate risk approach for the determination of substantial risk and hold that the agency may address risk factors individually so long as it considers all sources of and reasons for risk cumulatively to

determine whether there is a substantial risk of torture."); *Omar v. Barr*, 962 F.3d 1061, 1065 (8th Cir. 2020) ("The Board has recognized that claims under the CAT must be considered in terms of the aggregate risk of torture from all sources."); *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015) (finding that remand was required because "CAT's implementing regulations require the agency to consider 'all evidence relevant to the possibility of future torture'" and therefore, "CAT claims must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible CAT claims" (quoting 8 C.F.R. § 1208.16(c)(3))). The Board has also endorsed this approach. *See Matter of J-R-G-P-*, 27 I. & N. 482, 484 (BIA 2018) ("Claims under the Convention Against Torture 'must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible . . . claims.'" (quoting *Quijada-Aguilar*, 799 F.3d at 1308)).

We, however, have not yet addressed definitively whether the Board is required to assess a petitioner's risk of torture in the aggregate. A recent panel identified this trend but declined to adopt a stance on the issue because the Board in that case had used the aggregate approach. *See Yousif*, 53 F.4th at 935 & n.1 ("[W]e have not held that the [Board] *must* apply the aggregate approach, and we need not make that decision today because the [Board] did an aggregate analysis."). Similarly, earlier panels have assumed, without deciding, that the aggregate approach applied and that the Board was required to consider the probability of torture in the aggregate. *See Marqus*, 968 F.3d at 589 (noting that "[o]ther circuits interpret § 1208.16(c)(3) to require the [Board] and the IJ to consider the aggregate probability of torture from independent sources or for independent reasons, rather than assess the probability of torture from each source or for each reason separately" and then "presum[ing] for the purposes of this analysis that the aggregation rule applies"); *see also Shakkuri v. Barr*, 780 F. App'x 286, 291 (6th Cir. 2019) ("First, in determining whether an applicant has established that it is more likely than not that he or she would be tortured if deported to the country of removal, the probability of torture from all entities and for all reasons must be considered in the aggregate.").

Unlike prior panels that have declined to resolve whether the Board is required to apply the aggregate rule because the Board in those cases had applied the aggregate rule, *see, e.g.*, *Yousif*, 53 F.4th at 935 & n.1, here, as explained below, the Board has not assessed Abdulahad's

risk of torture in the aggregate.   Therefore, and in light of the Board's endorsement of the aggregate approach, this court's prior use of the standard, and the clear trend in the other circuits that have addressed this issue, we formally adopt the standard as stated in *Marqus* and *Matter of J-R-G-P-*.   If a petitioner invokes more than one independent source of or reason for the risk of torture, the Board must consider the petitioner's risk of torture in the aggregate.  *Matter of J-R-G-P-*, 27 I. & N. at 484.   Under the aggregate rule, a petitioner "alleging probable torture from independent sources 'need not demonstrate that the probability of torture by one of the entities,' or for one of the reasons, 'taken alone, exceeds 50%.'   Instead, the question is whether the 'cumulative probability of torture by [all of the] entities,' or for all reasons, 'exceeds 50%.'" *Marqus*, 968 F.3d at 589 (quoting *Shakkuri*, 780 F. App'x at 291)).**[5]**

Here, the Board made clear that it was not applying the aggregate approach and instead it focused almost entirely on Abdulahad's status as Chaldean Christian.  *See, e.g.*, A.R. at 5 (8/24/2022 BIA Dec. at 3) (discounting the 2020 Iraq Crime and Safety Report, which "reflects that Iranian-backed Shia militia groups have launched attacks throughout Iraq to threaten coalition forces and encourage expulsion of United States and coalition forces" because "the report d[id] not detail torture against Chaldean Christians"); *id.* at 8 (8/24/2022 BIA Dec. at 6) (finding that Abdulahad did not establish a reasonable likelihood of torture because "the evidence does not reflect a reasonable likelihood . . . that [he] would be detained at a checkpoint because he is a Christian").

The Board dedicated much of its decision to determining whether the evidence was new, cumulative, or material, *id.* at 3–7 (8/24/2022 BIA Dec. at 1–5), and discussed Abdulahad's risk of torture in only two paragraphs, *id.* at 7–8 (8/24/2022 BIA Dec. at 5–6).   In the first paragraph on this topic, the Board found that "the evidence does not reflect a reasonable likelihood that [Abdulahad] can show that any persecutor or Iraqi official would specifically intend to inflict severe pain or suffering on him."  *Id.* at 7 (8/24/2022 BIA Dec. at 5).   In other words, there was no risk of torture that was directed at Abdulahad specifically—a separate requirement for DCAT

---

**[5]**The dissent contends that we impose a new legal requirement on the Board.  Dissent at 32 (describing the aggregate approach as a "new legal imposition").  This is plainly incorrect because the Board's own precedent has required that it apply the aggregate approach since 2018.  *See Matter of J-R-G-P-*, 27 I. & N. at 484.

relief.  Then, in the following paragraph, the Board explicitly engaged in a causal-chain analysis[6] by listing the chain of events that Abdulahad included in his motion, citing the legal standard for the causal-chain analysis, and evaluating the causal-chain claim in a single sentence.  *Id.* at 8 (8/24/2022 BIA Dec. at 6).  The Board did not cite the *Matter of J-R-G-P-* standard at any point in the decision and did not include any analysis that resembled the aggregate approach.  Because we "may not assume that the Board considered factors that it failed to mention in its opinion," *Preçetaj*, 907 F.3d at 458, there is no basis to find that the Board applied the aggregate approach.

Even if the Board integrated its aggregate and causal-chain analyses as the dissent proposes,[7] there is no basis to conclude that there was an analysis of Abdulahad's aggregate claim that was *independent* of his causal-chain claim.  We do not suggest, as the dissent states, that "the Board's causal[-]chain analysis cannot satisfy its obligation to engage in an aggregate analysis."  Dissent at 33.  The causal-chain and aggregate analyses can and should be integrated if the petitioner's claims are interdependent.  The aggregate and causal-chain approaches are not mutually exclusive, and petitioners can raise "*both* independent *and* interdependent probabilities of torture" as Abdulahad did here.  *Shakkuri*, 780 F. App'x at 292.  Without any indication of an independent analysis of the aggregate claim, we cannot assume there was one.

To be clear, the Board is not required to analyze independently a claim in the aggregate in all cases; it is, however, required to analyze the claims made by the petitioner.  *See Marqus*,

---

[6]The Board is required to apply a causal-chain analysis when a petitioner claims that the evidence shows that a "hypothetical chain of events is more likely than not to happen" and, as a result, there is a "probability of torture." *Matter of J-F-F-*, 23 I. & N. Dec. 912, 917–18 (AG 2006).  The Board construed a portion of Abdulahad's claim as a causal-chain claim because it depended on Abdulahad encountering checkpoints after leaving the airport, being detained at one of the checkpoints, and thereafter, being tortured. A.R. at 8 (8/24/2022 BIA Dec. at 6). Abdulahad does not explicitly argue that the Board's causal-chain analysis was incorrect; instead, he argues that the Board was also required to consider his other claims and to do so in the aggregate. Pet'r Br. at 37 ("Critically, the aggregate and causal-chain approaches are neither inconsistent nor mutually exclusive, and applicants frequently raise '*both* independent *and* interdependent probabilities of torture.'" (quoting *Shakkuri*, 780 F. App'x at 292)).

[7]The dissent incorrectly states that "the Board acknowledged a few of Abdulahad's traits, including his status as a deportee" in the Board's "hypothetical causal[-]chain analysis." Dissent at 33 (citing A.R. at 8 (8/24/2022 BIA Dec. at 6)). The Board's causal-chain analysis does not use the word deportee and, even if it had, the word deportee does not encapsulate what the dissent suggests. *Cf. infra* n.8. Moreover, the Board's analysis in this paragraph is two sentences in which the Board assessed Abdulahad's Christianity, but no other traits. *See* A.R. at 8 (8/24/2022 BIA Dec. at 6) ("For instance, while the evidence shows that Iraqi government officials tortured detainees, the evidence does not reflect a reasonable likelihood that it is more likely than not that the respondent would be detained at a checkpoint because he is a Christian and that it is more likely than not that he would then be tortured.").

968 F.3d at 592 (stating that the Board must "'analyze and explain the basis on which it decides against [the petitioner],' meaning it must actually consider . . . the arguments put forth by the [petitioner]" (quoting *Preçetaj*, 907 F.3d at 459)).  Here, Abdulahad has made an independent aggregate claim, A.R. at 75 (6/9/2022 Mot. to Reopen at 9), and there is no basis to conclude that the Board analyzed it.

Finally, the government suggests that the Board was "simply responding to [Abdulahad's] argument that" his risk of torture relies on a causal chain.  Resp't Br. at 45. Although Abdulahad may have made a causal-chain claim, the government's argument does not address the fact that the Board did not evaluate Abdulahad's independent argument—explicitly invoked in his motion to reopen—that his risk of torture should be considered in the aggregate. *See* A.R. at 75 (6/9/2022 Mot. to Reopen at 9) (listing Abdulahad's characteristics that put him at risk of torture and arguing that "[i]ndividually or in combination, these factors make it more likely than not that he will be tortured in Iraq").  Accordingly, we hold that the Board abused its discretion by failing to apply the aggregate approach.

### 3.  Particularized Risk of Torture

Abdulahad next argues that even if the Board applied the correct legal standards, it abused its discretion by failing to articulate a reasoned basis for concluding that he did not establish a reasonable likelihood of torture.  Pet'r Br. at 41.  Although the Board is not required "to mention every piece of evidence before it or every logical element of a motion, it is nevertheless compelled to analyze and explain the basis on which it decides against a petitioner." *Preçetaj*, 907 F.3d at 458 (quoting *Lindor v. Holder*, 317 F. App'x 492, 498 (6th Cir. 2009)).  If the Board "does not articulate a reasoned basis for rejecting the motion or fails to consider all the aspects of the petitioner's claim, it has abused its discretion." *Id.* at 459 (quoting *Habchy v. Filip*, 552 F.3d 911, 915 (8th Cir. 2009)).  "Cursory, summary, or conclusory statements are inadequate." *Daneshvar*, 355 F.3d at 626.  But, if a "necessary element" of the petitioner's claim fails, the Board "owe[s] no duty to rehearse the rest of [the petitioner's] evidence for sake of completeness." *Yan Xia Zhang v. Mukasey*, 543 F.3d 851, 854–55 (6th Cir. 2008).

The Board abuses its discretion if it explicitly considers some but not all of the critical bases of a petitioner's claim. *See Morales-Morales v. Garland*, No. 22-3134, 2022 WL 17660787, at *4 (6th Cir. Dec. 14, 2022) (finding that the Board abused its discretion because it addressed whether the petitioner was persecuted based on two of her claimed social groups but "the [Board] did not address whether [the petitioner's] testimony . . . established that she was persecuted because of her status as an indigenous Guatemalan woman"—a third and separate social group that the petitioner claimed); *Preçetaj*, 907 F.3d at 459 (finding that the Board abused its discretion because it did not address the petitioner's claim based on "issues concerning her family's political activities"); *Lindor*, 317 F. App'x at 496–98 (finding that the Board abused its discretion, despite considering the petitioner's claim based on his own political speech, because the Board did not address the petitioner's claim based on his family's political persecution in Haiti). Similarly, it is an abuse of discretion if the Board "fail[s] to consider several critical pieces of evidence." *Mandebvu v. Holder*, 755 F.3d 417, 431 (6th Cir. 2014); *see also Mostafa v. Ashcroft*, 395 F.3d 622, 625–26 (6th Cir. 2005) (finding the Board abused its discretion where the Board failed to consider relevant record evidence because the "reports were never mentioned in the Board's opinion").

As noted above, the Board dedicated most of its decision to discussing whether Abdulahad's evidence was "new," "cumulative," or "material," such that reopening was warranted. *See supra* Part III.B.1; A.R. at 4–7 (8/24/2022 BIA Dec. at 2–5). The Board then dedicated only two paragraphs to assessing Abdulahad's risk of torture. A.R. at 7–8 (8/24/2022 BIA Dec. at 5–6). In these paragraphs, the Board noted that Abdulahad's argument included a risk of torture based on his status as a Chaldean Christian, the "rising tensions between the United States and Iran," and Abdulahad's perceived "danger to Iraqi society." *Id.* at 8 (8/24/2022 BIA Dec. at 6). Yet, the Board's analysis explicitly explained why Abdulahad's evidence was insufficient to establish a risk of torture based only on his status as a Chaldean Christian. *Id.* at 7 (8/24/2022 BIA Dec. at 5) ("Although the evidence reflects . . . that Christians remain at high risk of persecution in Iraq, the evidence does not reflect a reasonable likelihood that the respondent can show that any persecutor or Iraqi official would specifically intend to inflict severe pain or suffering on him."); *id.* at 8 (8/24/2022 BIA Dec. at 6) ("[T]he evidence does not reflect a reasonable likelihood that it is more likely than not that the respondent would

be detained at a checkpoint because he is a Christian and that it is more likely than not that he would then be tortured."). Because the Board's analysis of Abdulahad's risk of torture does not mention any of his other claims, there is no basis to conclude that the Board considered the other characteristics that he argues put him at risk of torture.[8]

The Board's failure to analyze Abdulahad's other characteristics is an abuse of discretion. *See, e.g.*, *Morales-Morales*, 2022 WL 17660787, at *4. And, even if this court could assume that the Board considered each characteristic that Abdulahad raised, the Board failed to "explain the basis on which it decide[d] against" him. *Preçetaj*, 907 F.3d at 458 (quoting *Lindor*, 317 F. App'x at 498).

Abdulahad also argues that the Board abused its discretion because it did not articulate a rational explanation for why it concluded that Abdulahad did not establish a particularized risk of torture. Pet'r Br. at 47. To establish prima facie eligibility for DCAT relief, Abdulahad must establish a "particularized threat of torture." *Almuhtaseb v. Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006) (quoting *Castellano-Chacon v. I.N.S.*, 341 F.3d 533, 551 (6th Cir. 2003)). By way of example, a petitioner may establish a particularized threat of torture by submitting evidence that individuals that share the petitioner's characteristics are being tortured in the country of removal, *see Marqus*, 968 F.3d at 591 (explaining that "evidence of torture of Chaldean Christians is sufficient to show a particularized threat" of torture to support a CAT claim), or evidence that the petitioner was previously tortured in the country of removal and that the threat of torture remains, *see Bi Xia Qu v. Holder*, 618 F.3d 602, 610 (6th Cir. 2010) (finding that the petitioner "may have a viable claim for CAT protection" because she credibly testified about past instances of torture).[9] Evidence that is "too generalized and too speculative" cannot "form the basis of relief." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1155–56 (6th Cir. 2010).

---

[8]The dissent suggests that Abdulahad's status as a deportee "subsume[s]" his other claimed bases for relief, Dissent at 33 n.2, but this characterization assumes that Iraqi deportees typically spend a long period of time in the United States, lack any meaningful ties to Iraq, and do not have Iraqi identification documents. There is no basis to make such broad assumptions and, indeed, many people may have been deported immediately upon arrival to the United States and, therefore, would likely not share *any* of the above characteristics with Abdulahad.

[9]*Cf. Castallano-Chacon*, 341 F.3d at 552 (finding that the petitioner did not establish a particularized risk of torture because his "evidence described the targeting of young gang members, generally twenty-three-years-old or younger" and the petitioner was "not similarly situated since [he was] twenty-seven-years-old"); *Almuhtasehb*,

Here, the Board explained that Abdulahad's evidence showed that the PMFs "commit gross human rights violations, including torture, that Iraqi government officials have employed torture and other cruel treatment or punishment, and that Christians remain at high risk of persecution in Iraq." A.R. at 7 (8/24/2022 BIA Dec. at 5). The Board also suggested that the evidence "might support [Abdulahad's] argument that Iraqi Christians or deportees are at risk of detention and torture." *Id.* at 5 (8/24/2022 BIA Dec. at 3). Nonetheless, the Board concluded, without additional explanation, that "the evidence does not reflect a reasonable likelihood that [Abdulahad] can show that any persecutor or Iraqi official would specifically intend to inflict severe pain or suffering on [Abdulahad]." *Id.* at 7 (8/24/2022 BIA Dec. at 5).[10]

In addition to failing to explain why Abdulahad's status as a Chaldean Christian was insufficient, the Board also did not determine whether any of the other bases of Abdulahad's claim—such as his ties to the United States, criminal history, or lack of identification documents—established a particularized risk of torture, either independently or in conjunction with one another. Without additional explanation from the Board, we cannot discern whether the Board's analysis was correct.[11] Thus, the Board abused its discretion by not articulating a reasoned basis for its decision that addressed the relevant information. *See Preçetaj*, 907 F.3d at 459 ("[I]f [the Board] does not articulate a reasoned basis for rejecting the motion . . . , it has abused its discretion.").

---

453 F.3d at 746, 751 (finding that the petitioner's evidence of violence against Palestinians in the West Bank could not establish a particularized threat of torture because the petitioner claimed relief based on her family members' political views).

[10]*Yousif* does not alter this analysis because it is factually distinct from Abdulahad's case. *Cf.* Dissent at 31. Stated simply, Yousif testified at his merits hearing that he felt there was no particularized threat against him, and, in his motion to remand, he presented evidence that was cumulative of his merits hearing evidence depicting general threats of violence and harms that did not amount to torture. *Yousif*, 53 F.4th at 932, 934. Unsurprisingly, we denied Yousif's petition to review the Board's decision denying the motion to reopen. *Id.* at 936–37.

[11]The dissent concludes that "[t]he Board was within its discretion to determine that Abdulahad's mere identification of conditions in Iraq and his own characteristics was not enough" based on the Board's single sentence of reasoning and the cases cited thereafter. Dissent at 30–31. The dissent does not and cannot identify any aspect of the Board's particularized-risk reasoning that addresses Abdulahad's other claimed bases of relief. *See supra* n.8. Moreover, even if, as the dissent suggests, the Board correctly analyzed Abdulahad's particularized risk based on his Christianity, the Board would still have failed to address whether Abdulahad faced a particularized risk of torture based on his other characteristics. Because the Board "fail[ed] to consider all the aspects of the petitioner's claim, it has abused its discretion." *Preçetaj*, 907 F.3d at 459 (quoting *Habchy v. Filip*, 552 F.3d 911, 915 (8th Cir. 2009)).

**4. Harmless Error**

Finally, the government argues that we should deny Abdulahad's petition because any errors the Board made were harmless. Resp't Br. at 34–35 (citing *Japarkulova v. Holder*, 615 F.3d 696 (6th Cir. 2010)). Generally, we should "remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam); *see also Thomas*, 547 U.S. at 186–87 (remanding a case to the Board because "[t]he agency ha[d] not yet considered" the facts or "whether the facts as found fall within a statutory term" and thus the Ninth Circuit should not have "determin[ed] . . . the matter in the first instance"). "This principle has obvious importance in the immigration context" because "[t]he agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides." *Orlando Ventura*, 537 U.S. at 16–17.

In this Circuit, we have endorsed a limited application of the harmless-error doctrine in the immigration context. "When . . . the [Board] does not make the proper inquiry and legal conclusions, supported by legal analysis and reasoning, the 'proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007) (quoting *Thomas*, 547 U.S. at 186). "[S]imply because the Board *may* reach the same result upon remand (and of course, it may not) does not render the Board's action 'harmless'" because "[t]he Board must articulate the rationale for this decision." *Preçetaj*, 907 F.3d at 459. If "the agency's reasoning was inadequate, its decision may be upheld on the basis of harmless error if the petitioner's prospects are otherwise so weak that there is no 'reason to believe . . . remand might lead to a different result.'" *Japarkulova*, 615 F.3d at 701 (quoting *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005)). In other words, remand is not required when doing so "would be futile." *Karimijanaki v. Holder*, 579 F.3d 710, 721 (6th Cir. 2009).

Here, the Board's errors impacted every aspect of its decision and therefore, this is not a case in which the "petitioner's prospects are otherwise so weak that there is no 'reason to believe that . . . remand might lead to a different result.'" *Japarkulova*, 615 F.3d at 701 (quoting

*Shkabari*, 427 F.3d at 328).  More specifically, the Board applied the incorrect legal standard when determining whether the evidence was new, cumulative, or material;[12] did not assess Abdulahad's claims in the aggregate; and did not sufficiently explain or consider the evidence related to his particularized likelihood of torture.[13] *See supra* Parts III.B.1–3.

A closer review of the evidence also supports this conclusion.  For example, when denying Abdulahad's DCAT petition in 2018, Immigration Judge Paruch reasoned that the threat from Da'esh was essentially non-existent because Da'esh had been "routed from all but a small portion of Iraq."  A.R. at 1148 (2/28/2018 IJ Order at 11) (quotations omitted).  As it related to the PMFs, Immigration Judge Paruch stated that Abdulahad would be at risk only if he had ties to Da'esh and that Abdulahad's "long residence in the United States . . . essentially exonerates him from any fear of detention or harm" by the PMFs.  *Id.* at 1150 (2/28/2018 IJ Order at 13).  Immigration Judge Paruch also emphasized that any PMF human-rights violations were being investigated by the Iraqi government and therefore, the government did not acquiesce to this harm.  *Id.* at 1149–50 (2/28/2018 IJ Order at 12–13).

In contrast, Abdulahad's new evidence suggests that the situation has materially worsened, particularly for someone with his characteristics.  By way of example, the PMFs that have been committing human-rights abuses are concentrated in ethnically and religiously diverse

---

[12]The dissent contends that the Board's conclusion that much of Abdulahad's evidence was previously available or cumulative was harmless because only ten months elapsed between Abdulahad's merits hearing and his first motion to reopen.  Dissent at 28.  Although factually accurate, the dissent assumes that country conditions could not materially change in ten months and, thus, fails to engage meaningfully with the substance of the evidence.  Instead, the dissent offers only the conclusory statement that "[t]here is no evidence in the record that conditions in Iraq in the ten months between February and December 2018 changed materially."  *Id.*  As is explained below, *see infra* pp. 22–25, an assessment of the evidence in the record, using the correct temporal comparison, reveals that this is far from the "rare circumstance[]" in which remand would be futile.  *Mapouya*, 487 F.3d at 405 (quoting *Thomas*, 547 U.S. at 186).

The dissent also contends that the Board's use of an incorrect legal standard for assessing whether evidence was new or cumulative was harmless error because the Board also concluded that Abdulahad's evidence was not material.  Dissent at 28–29.  This misstates the record.  The Board disregarded much of Abdulahad's evidence as cumulative or not new and never addressed whether many pieces of evidence were material.  *See* A.R. at 5–7.  Thus, even if we assume that the Board's materiality determinations were correct—which, as explained above, they were not—this cannot form "an independent and sufficient ground to deny [the] motion to reopen."  Dissent at 28.

[13]The dissent would also find that the Board's failure to conduct the aggregate analysis and failure to provide a reasoned explanation as to the particularized risk of torture were harmless errors because there is an independent basis to uphold the decision:  the Board's determination that Abdulahad did not introduce new, material evidence.  Dissent at 33–34.  For the reasons already explained, the Board applied the incorrect legal standards when analyzing whether evidence was new or material.  *See supra* Part III.B.1.

areas, such as where Christians reside in the Ninewa Province, and the PMFs have been specifically targeting Christians and other religious minorities. *See* A.R. at 92 (2021 Human Rights Report: Iraq at 4) ("Iran-aligned [PMFs] engaged in killing, kidnapping, and extortion throughout the country, particularly in ethnically and religiously mixed provinces."); *id.* at 98 (2021 Human Rights Report: Iraq at 10) ("There were reports of Iran-aligned PMF groups also arbitrarily or unlawfully detaining . . . Christians, and other members of minority groups in Ninewa Province. There were numerous reports of 30th and 50th PMF Brigades' involvement in extortion, illegal arrests, kidnappings, and detention of individuals without warrants."); *id.* at 129 (2021 Human Rights Report: Iraq at 58) ("Government forces, particularly certain PMF groups, and other militias targeted members of ethnic and religious minority groups, as did the remaining active ISIS fighters.").

Additionally, the PMFs have become increasingly violent towards U.S. officials and citizens. *See* A.R. at 137 (9/2/2021 Iraq Security Report at 2) (assessing Baghdad and Erbil as "CRITICAL-threat locations for terrorism directed at or affecting official U.S. government interests" and warning that "the kidnapping threat comes almost exclusively from militia groups, who may use it as a method to undermine U.S. diplomatic, military, and economic objectives in Iraq, or from criminal groups targeting individuals they perceive to be wealthy"); A.R. at 378 (5/2019 Lattimer Decl. at 7 ¶ 18) (stating that the PMFs that are not affiliated with Iran "also display openly anti-American animus"); A.R. at 390–91 (2/2020 Smith Decl. at 6 ¶ 26) (noting that in "November 2019, Iran-backed PMF militias increased the frequency with which they fired rockets at the U.S. Embassy," in December 2019 "PMF militia members, followers, and some commanders breached the U.S. Embassy compound in Baghdad and burned a portion of the outer facility," in January 2020 the United States "assassinat[ed] . . . Qassem Soleimani and Iraqi PMF militia leader Abu Madi al-Muhandis," and in January 2020 "[t]ens of thousands of Iraqis marched in multiple cities . . . to protest the U.S. killing of General Soleimani and the U.S. military presence in Iraq"); *id.* at 395 (2/2020 Smith Decl. at 11 ¶ 37 (explaining that the PMFs have engaged in "open warfare against U.S. forces, U.S. interests, and individuals associated with the United States" through "forced disappearances, torture, murder, ethnic/sectarian cleansing and other mass displacement").

The PMFs have been targeting U.S. citizens because the PMFs believe that U.S. citizens are involved in the ongoing protests. *See* A.R. at 213 (5/12/2020 Crime and Safety Report at 1) (stating that Iran-backed PMFs "have resorted to launching more frequent and lethal indirect fire incidents throughout Iraq in order to threaten the Coalition forces" in response to "anti-government protests" and noting that the "attacks may not distinguish between official and unofficial U.S. travelers," so U.S. citizens should "exercise extreme vigilance, particularly during movements"); A.R. at 394 (2/2020 Smith Decl. at 10 ¶ 36) (stating that there "is a false but widespread and publicly voiced belief by prominent politicians, security officials, PMF militia leaders, and Iranian officials that the U.S. is behind and actively supports the protests"). The violence has escalated to the point that the U.S. ordered non-essential government employees to evacuate from the embassy in Baghdad, A.R. at 134 (4/15/2022 Travel Advisory at 2), and sanctioned Iraqi militia leaders for the militia's activities, A.R. at 368 (7/2019 New York Times Article at 1) (reporting that President Trump "impos[ed] economic sanctions on" two militia leaders in Iraq—"the head of the 50th Brigade, and . . . the head of the 30th Brigade"—because they were "involved in acts of corruption, extortion and intimidation in Nineveh Province, which has minority populations of Christians and Yazidis").

Finally, the Iraqi government's investigations into the PMFs have not resulted in any form of accountability and the PMFs have continued to gain power by infiltrating the government. *See* A.R. at 91 (2021 Human Rights Report: Iraq at 3) (stating that the PMFs "operated with impunity" and that, despite the government's efforts to "identify, investigate, and prosecute" human rights abuses, these abuses were "rarely punished"); A.R. at 131 (2021 U.S. Comm'n on Int'l Religious Freedom at 1) ("In 2020, the PMF operated with impunity in the Nineveh Plains and Sinjar, committing heinous [human rights] violations against [religious minorities]."); A.R. at 396 (2/2020 Smith Decl. at 12 ¶ 40) (stating that "political coalitions led by PMF militia leaders were the top two vote-getters in the May 2018 national elections" and "[t]his political win has increased the influence and reach of these militias in the Iraqi government").

Daniel Smith, in his February 2020 expert declaration, also suggested that the government's experts, Denise Natali and Michael Rubin, would agree that the threat posed by the

PMFs has increased. *See* A.R. at 397 (2/2020 Smith Decl. at 13 ¶¶ 43–44) (explaining that Natali has publicly stated that militias "obstruct assistance, they stoke sectarian tensions[,] prevent [internally displaced persons from] return[ing], destabilize local politics, and exacerbate the conflict economy" and that Rubin authored a 2019 article in which he stated "[s]ymbolic action to take on Iranian-backed militias is easy, but [the Iraqi government's] July executive order did little to tackle the substantive problems," such as "stop[ping] the militias from individual recruitment and training").

Accordingly, this is not a case in which remand would be futile. *See Karimijanaki*, 579 F.3d at 721.

## IV. CONCLUSION

For the foregoing reasons, we **GRANT** the petition, **VACATE** the Board's decision, and **REMAND** the case to the Board for proceedings consistent with this opinion.

---

**DISSENT**

---

JULIA SMITH GIBBONS, Circuit Judge, dissenting.  Because I disagree that the Board of Immigration Appeals ("the Board") abused its discretion in this case, I respectfully dissent.

### I.

At the outset, recall that we review the Board's decision for abuse of discretion.  *Preçetaj v. Sessions*, 907 F.3d 453, 457 (6th Cir. 2018).  This is a relaxed, undemanding standard, especially in the context of motions to reopen.  "The Supreme Court has made clear that reopening is discretionary with the BIA and that the BIA retains *broad* discretion to grant or deny such motions."  *Id.* (quoting *Alizoti v. Gonzales*, 477 F.3d 448, 451 (6th Cir. 2007)) (emphasis added).  "Because the BIA has such broad discretion, a party seeking reopening . . . bears a 'heavy burden.'"  *Id.* (quoting *Alizoti*, 447 F.3d at 451).  Appellate courts must accord "great deference" to the Board's denial of motions to reopen because, as the Supreme Court acknowledged, "[t]here is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases."  *Bi Feng Liu v. Holder*, 560 F.3d 485, 489 (6th Cir. 2009) (quoting *INS v. Abudu*, 485 U.S. 94, 107 (1988)).  Abdulahad has already had a fair opportunity to present his case: This is an appeal from the denial of his third motion to reopen.  *See* A.R. at 3.  And Abdulahad has repeatedly sought to reopen the immigration judge's denial of his deferral of removal, which itself resulted from a two-day merits hearing in which the parties submitted hundreds of pages of evidence and expert testimony on country conditions in Iraq.  *See id.* at 1139–40, 1142.  "Granting such motions [to reopen] too freely will permit endless delay of deportation" by petitioners creative enough "to continuously produce new and material facts sufficient to establish a prima facie case."  *Bi Feng Liu*, 560 F.3d at 490 (quoting *Abudu*, 485 U.S. at 108).

Even putting aside the Board's broad discretion, not every mistake is a reversible one. "[E]ven when the agency's reasoning was inadequate, its decision may be upheld on the basis of

harmless error if the petitioner's prospects are otherwise so weak that there is no 'reason to believe that . . . remand might lead to a different result.'" *Japarkulova v. Holder*, 615 F.3d 696, 701 (6th Cir. 2010) (quoting *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005)). As discussed below, each of the matters addressed by the majority are either subsumed by the deferential standard of review or fall within harmless error.

A.

The majority holds that the Board used the incorrect legal standard by comparing Abdulahad's evidence to his previous motion to reopen, filed on December 20, 2018, as opposed to his merits hearing evidence, and thus the Board abused its discretion. Maj. Op. at 8–9. Even if the Board made a mistaken comparison, its evaluation of the evidence as not new or cumulative was harmless error.

8 C.F.R. § 1003.2(c)(1) requires that a motion to reopen "shall state the new facts that will be proven at a hearing to be held if the motion is granted." 8 C.F.R. § 1003.2(c)(1). The Board may grant a motion to reopen proceedings if the "evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." *Id.* As a preliminary matter, it is important to note that this standard is conjunctive: The new evidence must be material *and* not available and not discoverable at the previous hearing. *Sakhawati v. Lynch*, 823 F.3d 852, 857 (6th Cir. 2016) (citing *Huang v. Ashcroft*, 113 F. App'x 695, 698 (6th Cir. 2004)).

The majority correctly notes that the proper inquiry compares the current evidence offered with the evidence offered at the merits hearing, not in a previous motion to reopen.[1] *See Hernandez-Perez v. Whitaker*, 911 F.3d 305, 317 (6th Cir. 2018); *Bi Feng Liu*, 560 F.3d at 491. And the majority is correct that there are places where the Board compares Abdulahad's offered evidence to the evidence presented with his first motion to reopen (filed in December 2018), as

---

[1]It is not clear that "at the former hearing" must necessarily mean "the hearing before the immigration judge" in this particular context, where the petitioner has filed multiple motions to reopen, at least one of which was fully adjudicated on the merits. *See Mbonga v. Garland*, No. 22-3851, 2023 WL 6785990 (6th Cir. Oct. 13, 2023) (rejecting the interpretation that the "former hearing" means "the last hearing before an immigration judge").

opposed to the evidence presented at his February 2018 hearing. *See, e.g.*, Maj. Op. at 8–9. But those comparisons using the incorrect legal standard are harmless error.

First, those comparisons with the evidence at the first motion to reopen, as opposed to the evidence at the merits hearing, is a distinction without a functional difference. Abdulahad's first motion to reopen was filed in December 2018. *See* A.R. at 665. This followed his merits hearing—held in February 2018—by only ten months. *See* A.R. at 1261; *id.* at 1138. There is no evidence in the record that conditions in Iraq in the ten months between February and December 2018 changed materially. *See, e.g.*, CA6 R. 25, Respondent Br., at 22–33 (demonstrating a lack of material change in country conditions from the submitted evidence). It was thus harmless error for the Board to compare Abdulahad's offered evidence with the evidence submitted in December 2018, as opposed to the evidence in February 2018. There is no reason to believe that remanding to the agency "for additional investigation or explanation" would lead to a different result. *See Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007) (quoting *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam)).

Second, the Board held that the evidence Abdulahad submitted was not material. The Board's comparison of evidence submitted with his current motion and the prior motion was in explanation to why some of the evidence was not "new," and was separate from whether the evidence demonstrated materially changed country conditions. Evidence is "material" if it would change the outcome, if proved. *Mbaye v. Holder*, 369 F. App'x 688, 695 (6th Cir. 2010). "Put another way, evidence must be presented to convince the BIA that 'if proceedings before the immigration judge were reopened . . . the new evidence offered *would likely change the result in the case*.'" *Abeshi v. Mukasey*, 259 F. App'x 775, 778 (6th Cir. 2008) (quoting *Matter of Coelho*, 20 I. & N. Dec. 464, 473 (BIA 1992)) (emphasis added). Here, the Board found that the evidence Abdulahad submitted was not material enough to justify reopening; in other words, it would not change the result in the case. *See* A.R. at 4–7. Per the regulations, that is an independent and sufficient ground to deny a motion to reopen. 8 C.F.R. § 1003.2(c)(1); *Sakhawati*, 823 F.3d at 857 (describing the motion to reopen standard as "conjunctive"); *see also Huang*, 113 F. App'x at 698. Thus, any incorrect comparison was harmless error, because it

would not change the result—the evidence is still immaterial even if "new." *See Japarkulova*, 615 F.3d at 701.

## B.

The majority also holds that the Board abused its discretion in deciding there was no material change in Iraq's country conditions under the wrong legal standard. Maj. Op. at 11–12. Specifically, the majority reiterates that incremental or incidental change does not establish materially changed country conditions, *see Matter of S-Y-G*, 24 I. & N. Dec. 247, 257 (BIA 2007), whereas the escalation of persecution of an already-targeted group can establish materially changed country conditions, *see Yu Yun Zhang v. Holder*, 702 F.3d 878, 880 (6th Cir. 2012). The majority holds that because the Board failed to explicitly cite or invoke this "incremental change" language, the Board did not provide a sufficient basis for this court to review its reasoning on the issue, and thus abused its discretion. *See* Maj. Op. at 11–12. But this ignores two points: First, the Board need not invoke any magic words, and instead must provide only a rational explanation for its decision, and second, the Board's opinion found neither incremental nor escalating change, but rather that there was no material change at all, thus obviating the need to invoke either legal test.

First, there are no magic words that the Board must invoke to provide a sufficient basis to evaluate its reasoning. The Board does not need to "write an exegesis on every contention," but need only "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Trujillo Diaz v. Sessions*, 880 F.3d 244, 255 (6th Cir. 2018) (quoting *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003)). The Board here did not "merely react[]" and give a "[c]ursory, summary, or conclusory" statement. *Id.* (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004)). The majority faults the Board's opinion because the Board did not explicitly write that Abdulahad's evidence was not material because it showed only "incremental change" and not the "escalation" of persecution of an already-targeted group. Maj. Op. at 11–12. But the Board's opinion can—and did—use the proper legal test without invoking the explicit language that the majority demands. *See* A.R. at 5 ("[T]his evidence (as well as the other country conditions reports and news articles) largely reflects a continuation of the general mistreatment that Christians (and religious and ethnic

minorities) have faced in Iraq[,]" thus describing no change or incremental change and not escalation); *id.* at 7 ("[T]he evidence largely reflects a continuation of the development of the status and activities of the PMFs and the continued suspicion of those perceived to have a connection to the United States, as well as continued risk to Christian and other minority populations in Iraq[,]" and concluding that "the attested changed country conditions are not material to justify reopening[,]" thus describing a continuation—not escalation—of country conditions).

Second, the Board's decision found that there was no material change in country conditions, as opposed to incremental change. A "continuation" of general mistreatment is not a change. *See Akrawi v. Garland*, No. 21-4071, 2022 WL 3681260, at *8 (6th Cir. Aug. 25, 2022) (finding that the "continu[ation]" of a threat does not show a material change in the threat, but instead shows country conditions as "remaining largely unchanged"). To find mere continuation, as opposed to intensification or escalation, was a rational and reasonable conclusion based upon the evidence that Abdulahad submitted. *See* CA6 R. 25, Respondent Br., at 22–33. The Board need not explicitly eschew the "incremental change" or "escalating change" tests, as its opinion establishes that it found no material change at all.

The Board has provided a sufficient basis for this court to review its reasoning. The Board found that the evidence showed a continuation of country conditions in Iraq, which is simply no change—neither an "incremental change" nor an "escalation." The Board thus did not abuse its discretion.

C.

Abdulahad's motion to reopen must show more than just new evidence of material changes in his country of removal. Abdulahad must also show that he faces a more likely than not chance that he would be subjected to *torture*. *See* 8 C.F.R. §§ 12.0816(c)(1), (c)(2). And Abdulahad must show that he specifically will be tortured, as opposed to a generalized threat for people with his characteristics. *Marqus v. Barr*, 968 F.3d 583, 587 (6th Cir. 2020) ("An applicant seeking CAT relief must demonstrate that []he faces a particularized and likely threat of torture at the hands of a public official, or with the consent or acquiescence of a public

official."). To prove this "particularized" threat of torture, Abdulahad must provide "more than general allegations of a threat against a group that [he] belongs to." *Saleh v. Barr*, 795 F. App'x 410, 419 (6th Cir. 2019). He must show it is more likely than not that *he himself* would be tortured within the meaning of CAT. *Yousif v. Garland*, 53 F.4th 928, 937 (6th Cir. 2022). The Board rationally determined that Abdulahad's evidence did not establish a reasonable likelihood that any persecutor or Iraqi official would "specifically intend to inflict severe pain or suffering *on him*." A.R. at 7 (emphasis added). The Board cited *Matter of J-E-*, 23 I. & N. Dec. 291, 303 (BIA 2002), among other cases, for the proposition that an applicant must allege specific grounds that indicate he would be personally at risk of torture upon removal. A.R. at 7. The Board's holding and subsequent citations demonstrate that it evaluated Abdulahad's proffered evidence and determined that he did not prove that he would be singled out for torture. Indeed, in *Yousif v. Garland*, we similarly upheld the Board where it found that the applicant's "new, proffered declarations and reports, even if taken at face value, do not show that it is 'more likely than not' that Yousif himself would be tortured within the meaning of CAT." 53 F.4th at 937. Even if Abdulahad had shown materially worsened conditions in Iraq, the fact that conditions have generally worsened does not show, in and of itself, that Abdulahad personally is at risk of torture. *See Jado v. Wilkinson*, 847 F. App'x 278, 287 (6th Cir. 2021); *see also Rofa v. Garland*, No. 22-3330, 2022 WL 17491839, at *4 (6th Cir. Dec. 8, 2022). The Board was within its discretion to determine that Abdulahad's mere identification of conditions in Iraq and his own characteristics was not enough. *See Almuhtaseb v. Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006), *overruled on other grounds by Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 228 (2020); *Rofa*, 2022 WL 17491839, at *4; *Akrawi*, 2022 WL 2293532, at *8; *see also Bi Xia Qu v. Holder*, 618 F.3d 602, 610 (6th Cir. 2010) (finding a likely particularized threat of torture where petitioner credibly testified she had been kidnapped, held hostage, was the victim of attempted rape, received threats by her attacker to have her hands and feet cut off if she attempted to escape, and that her attacker was a well-known thug in the "underground world," and that law enforcement did not intervene). Here, Abdulahad's evidence did not show it was more likely than not that he himself would be tortured, and the Board was within its discretion to deny relief on that ground.

The majority would reverse based on the Board's purported failure to assess Abdulahad's risk of torture in the aggregate. Here, for the first time in our circuit, the majority mandates the

Board apply the aggregate approach. *See Yousif*, 53 F.4th at 935 ("In this circuit, we have not held that the BIA *must* apply the aggregate approach, and we need not make that decision today because the BIA did an aggregate analysis.") (emphasis in original). Although several circuits have found that 8 C.F.R. § 1208.16(c)(3) requires an immigration judge to consider the aggregate risk of torture as to a particular plaintiff, this is the first time we mandate such a rule. This rule requires that if a petitioner invokes more than one independent source of or reason for the risk of torture, "the question is whether the 'cumulative probability of torture by [all of the] entities,' or for all reasons, 'exceeds 50%.'" *Marqus*, 968 F.3d at 589 (quoting *Shakkuri v. Barr*, 780 F. App'x 286, 291 (6th Cir. 2019)). An improperly disaggregated analysis would, on the other hand, "for example, first conclude that the applicant failed to demonstrate it was more likely than not that he would be tortured by rebel forces and secondly conclude that the applicant failed to demonstrate it was more likely than not that he would be tortured by the government." *Id.*

Even looking through the lens of the aggregate approach, the Board satisfied this new legal imposition. The Board did not limit its holding to any specific entity—the Board held that Abdulahad had "not shown a reasonable likelihood that he can establish a particularized risk of future torture in Iraq" because Abdulahad could not show that "*any persecutor or Iraqi official* would specifically intend to inflict severe pain or suffering on him." A.R. at 7 (emphasis added). *Marqus v. Barr* found that similar language in a Board opinion satisfied the aggregate analysis. *See* 968 F.3d at 589–90 (holding that the Board satisfied the aggregate analysis via its singular statement "the record does not reflect that the respondent is more likely than not to be tortured *by or with the acquiescence* of a public official in Iraq") (emphasis in original); *see also Yousif*, 53 F.4th at 935 (holding that the Board satisfied the aggregate analysis based on the single sentence stating "there is insufficient evidence on this record that the Iraqi government will seek to torture [Yousif] or that the government will acquiesce in his torture, including being willfully blind to such action") (citing *Solaka v. Wilkinson*, 844 F. App'x 797, 800 (6th Cir. 2021)). Unlike the disaggregated analysis per *Marqus*, the Board did not first conclude that Abdulahad faced no risk of torture from the Iraqi government and then conclude the same from non-state actors with the government's acquiescence. *Marqus*, 968 F.3d at 589. The Board thus aggregated the risk from both state and non-state actors. The fact that the Board did not explicitly state that it was using the "aggregate risk" test is not an abuse of discretion. *See Trujillo Diaz*, 880 F.3d at 255.

It is a closer question whether the Board failed to apply the aggregate analysis to Abdulahad's stated reasons for torture. The Board did not initially discuss all of Abdulahad's particular risk factors by name in its first paragraph of analysis of torture. But the Board did, in its second paragraph addressing torture, discuss more than Abdulahad's Chaldean Christian faith. There, the Board engaged in a hypothetical causal chain analysis. *See* A.R. at 8. In this analysis, the Board acknowledged a few of Abdulahad's traits, including his status as a deportee.**[2]** *Id.* The majority insinuates that the Board's causal chain analysis cannot satisfy its obligation to engage in an aggregate analysis. *See* Maj. Op. at 15–16. And although we treat the aggregate analysis and the causal chain analysis as separate analytical frameworks, we have not held that they are so separate that a discussion of traits in the causal chain analysis cannot as a matter of law satisfy the aggregate analysis. *See, e.g., Shakkuri*, 780 F. App'x at 293; *Yousif*, 53 F.4th at 935–36; *Saleh*, 795 F. App'x at 418 ("Rather than assessing whether Petitioner would be picked up for each reason individually, the BIA took account of the independent reasons Petitioner may be identified in total in its analysis."). And so I cannot say that the Board abused its discretion by conducting the aggregate analysis within the context of a causal chain analysis. The Board's analysis of Abdulahad's various traits was neither irrational nor inexplicably departed from established policies. *Preçetaj*, 907 F.3d at 457. Further, the location of the aggregate analysis within the causal chain analysis is harmless error—there is nothing to indicate that the result of the aggregate analysis will be any different upon reversal. *See Japarkulova*, 615 F.3d at 701.

Even if the Board erred by failing to apply the aggregate analysis to Abdulahad's six reasons for torture, and even if this error was not harmless, this still does not require reversal. There are three independent grounds on which the BIA might deny a motion to reopen—"failure to establish a prima facie case for the relief sought, failure to introduce previously unavailable, material evidence, and a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought." *Yan Xia Zhang v. Mukasey*, 543 F.3d 851, 854 (6th Cir. 2008) (quoting *INS v. Doherty*, 502 U.S. 314, 323 (1992)).

---

**[2]**Abdulahad's status as a deportee would seem to subsume a handful of his other traits, specifically his second (that he has a lengthy residence in and strong family ties to the United States), his third (that he has no ties to Iraq), his fifth (his lack of Iraqi identity documents), and his sixth (the notoriety of the planned mass removal of Iraqis from the United States).

The Board need only analyze and explain the basis on which it decides against a petitioner. *See id.* When a necessary element of a petitioner's claim fails, so does his entire motion. *See id.* The Board had already held that Abdulahad failed to introduce previously unavailable, material evidence. The Board "owed no duty to rehearse the rest" of Abdulahad's claims "for sake of completeness." *See id.* at 855.

## II.

In sum, I disagree with the majority's conclusion that the Board's decision was an abuse of discretion. I would affirm the Board's denial of Abdulahad's third motion to reopen.